IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| BLUE CROSS AND BLUE SHIELD OF ALABAMA; ) | |
| MUNICIPAL WORKERS COMPENSATION ) | |
| FUND, INC., ) | |
| ) | |
| PLAINTIFFS, ) | |
| ) | |
| ) | |
| ) | CASE NO. 06-CV-524-MEF-VPM |
| VS. ) | |
| ) | |
| ) | |
| PFIZER INC., ET AL., ) | |
| ) | |
| DEFENDANTS. ) | |

PLAINTIFFS' REPLY BRIEF IN FURTHER SUPPORT OF
MOTION TO REMAND TO STATE COURT
AND IN OPPOSITION TO MOTION TO STAY

Plaintiffs, Blue Cross and Blue Shield of Alabama ("Blue Cross") and the Municipal

Workers Compensation Fund, Inc. ("MWCF"), submit the following brief in further support of

Plaintiffs' Motion to Remand to State Court and Memorandum in Support Thereof ("Remand

Motion"), Dkt. 4-1, in reply to Defendants' Opposition to Plaintiffs' Motion to Remand ("Defs.

Opp."), Dkt. 11, and in compliance with this Court's Order of July 12, 2006, Dkt. 7. Plaintiffs also

submit this brief in opposition to the Motion to Stay All Proceedings Pending Transfer to

Multidistrict Litigation Proceeding ("Stay Motion"), filed by Defendants Pfizer Inc., Warner-

Lambert Company, Warner-Lambert Company LLC and Parke-Davis, a division of Warner Lambert

Company LLC and Warner-Lambert Company (collectively "Pfizer"), Dkt. 9-1, and in compliance

with this Court's Order of July 24, 2006.[1]

---

[1] While the Court gave Plaintiffs until August 4, 2006, to respond to Pfizer's Stay Motion,
(continued...)

## I.     THIS COURT SHOULD DENY PFIZER'S MOTION TO STAY AND CONSIDER PLAINTIFFS' MOTION TO REMAND IMMEDIATELY

As Plaintiffs predicted in their earlier Motion for Expedited Consideration of Plaintiffs' Motion to Remand to State Court, Dkt. 5-1, Pfizer removed this case, and now attempts to have it shipped off to the MDL in Boston, for the sole purpose of delay.  Pfizer has no credible argument to support removal or to oppose remand, so it tries now to postpone as long as possible the inevitable remand of this case to state court.

Plaintiffs do not question this Court's authority to stay proceedings before it, but would point out that the cases upon which Pfizer relies in this regard hardly help it. For instance, in *Landis v. North Am. Co.*, 299 U.S. 248 (1936), the Supreme Court did state, as Pfizer quotes at page 5 of its Stay Motion, that "incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis*, 299 U.S. at 254.

However, this sentence is immediately followed by the following: "How this can best be done calls for the exercise of judgment, which must weigh competing interests and maintain an even balance. True, the suppliant for a stay must make out a clear case of hardship or inequity in being required to go forward, if there is even a fair possibility that the stay for which he prays will work damage to some one else." *Id.* at 254-55.

The only hardship or inequity that could result in this case is to the Plaintiffs if the stay is granted. Although Pfizer cites to *Clinton v. Jones*, 520 U.S. 681 (1997), in urging this Court to

---

[1](...continued)
Plaintiffs address both their Remand Motion and Pfizer's Stay Motion here to avoid repetition of facts and law applicable to both.

exercise its discretion to stay, Stay Motion at 6, the Supreme Court in *Clinton*, reiterating that "[t]he proponent of a stay bears the burden of establishing its need," *id*. at 708, held that the district court had abused its discretion in granting a stay because, among other reasons, it would delay the plaintiff's opportunity to go to trial, which "would increase the danger of prejudice resulting from the loss of evidence, including the inability of witnesses to recall specific facts, or the possible death of party." *Id.* 707-08. Pfizer's reliance on *Clinton* is therefore baffling.

It is easy to understand, however, why Pfizer is desperate to delay remand to state court, where the case is certain to be on a faster track to conclusion than in the MDL, where there are over 150 RICO, personal injury and class action cases, with issues for the MDL Court to address that are simply not present here. Indeed, the MDL Court is so consumed with RICO and class certification issues, that it stayed remand motions pending its determination of class certification issues,[2] briefing of which has been stayed pending resolution of motions to dismiss.[3]

---

[2] *In re Neurontin Marketing, Sales Practices, and Products Liability Litigation*, MDL 1629 (Lead Case: *Harden Mfg. Corp. v. Pfizer, Inc.*, No. 1:04-cv-10981-PBS) ("MDL 1629") (D. Mass.), Dkt. 279 (Order staying remand orders pending ruling on class certification).

This Court may take judicial notice of the documents filed in the district courts here involved. *See United States v. Jones*, 29 F.3d 1549, 1553 (11th Cir. 1994); *Rothenberg v. Security Mgmt. Co.*, 667 F.2d 958, 961 n.8 (11th Cir. 1982); *U.S. v. Verlinsky*, 459 F.2d 1085, 1089 (5th Cir. 1972) (on petition for rehearing); *MacElvain v. United States*, 2002 WL 31083659, at *9 n.7 (M.D. Ala. 2002). In response to Pfizer's assertions regarding the circumstances and claims made in a number of cases in this and other district courts, Plaintiffs cite herein to a number of documents filed in those courts. These documents are available through the ECF/CM system, but Plaintiffs stand ready to provide copies to the Court, if the Court desires.

[3] MDL 1629, Dkt. Entry (unnumbered) dated 3/31/06 (Order staying class certification motions pending ruling on motions to dismiss).

The MDL Court's Order on Pfizer's first motion to dismiss was issued June 12, 2006,[4] but the court allowed the MDL plaintiffs to amend their complaints, which they did on June 30, 2006.[5] Pfizer's motion to dismiss was filed July 27, 2006,[6] and the MDL plaintiffs have until August 17, 2006, to file their opposition.[7] No hearing on the new motion to dismiss has been scheduled, so there is no way to know how long it will be before the MDL Court decides class certification issues - the trigger that would lift the stay of remand motions.    To date, no case has been remanded from MDL 1629, which was formed  in 2004.[8]

Therefore, Pfizer would clearly prefer that this case be transferred to the MDL without consideration of remand by this Court.  As is evident from Pfizer's motion, desperate times call for desperate measures.

---

[4]  MDL 1629, Dkt. 356 (Order on Motion to Dismiss).

[5]  MDL 1629, Dkt. 379 (Second Amended Class Action Complaint); Dkt. 380 (Second Coordinated Amended Complaint).

[6]  MDL 1629, Dkt. 399 (Motion to Dismiss).

[7]  MDL Dkt. (unnumbered) dated 7/18/06) (Order setting briefing schedule on motion to dismiss).

[8]  Plaintiffs have learned that, on June 19, 2006, the Order staying ruling on motions to remand was vacated as to the motion of one group of TPPs (the "Assurant Plaintiffs"), MDL 1629, Dkt. 372, which was filed in the District of New Jersey in January 2005, prior to transfer to the MDL. MDL 1629, Dkt. 125-3. The "Assurant Plaintiffs" is a group of TPPs who asked that the stay be lifted, arguing that their case is not a class action and involves only state law claims. MDL 1629, Dkt. 319-1 (Assurant Plainitffs' Brief in Support of Motion to Lift Stay of Remand), at 2.  However, although the stay was lifted on June 19, there has still been no ruling on the Assurant Plaintiffs' remand motion, which has been pending now for over 18 months.

In an obvious attempt to convince the Court that this case belongs in the MDL, Pfizer alerts

the Court that there are three TPP[9] cases pending in the MDL that were either filed in Alabama

(*Alabama Forest Products Indus. Worker's Compensation Self-Insurer's Fund v. Pfizer, Inc.*

(formerly pending as CV-04-0711 in the Middle District of Alabama) and *Gulf Distributing*

*Holdings, LLC v. Pfizer Inc.* (formerly pending as CV-04-0403 in the Southern District of Alabama))

or by an Alabama TPP, Harden Manufacturing Corp. Stay Motion at 2-3. Then, Pfizer claims that

the Plaintiffs' claims in this case are "just like the TPPs in the Neurontin MDL," *id*. at 3, and that

the "Plaintiffs' Complaint is virtually identical to the TPPs' complaints in the Neurontin MDL." *Id.*

Pfizer fails to note, however, that in both *Alabama Forest Products* and *Gulf Distributing*,

the TPP plaintiffs filed class action complaints in federal court, alleged diversity jurisdiction, filed

the notice of related action that requested transfer to the Neurontin MDL, and jointly moved with

Pfizer to stay the case pending transfer.[10]  With no jurisdictional issue raised, and plaintiffs that

wanted to be transferred to the MDL, it is no surprise that the cases were stayed pending transfer.[11]

---

[9] TPPs or "third-party payers" are Blue Cross plans, insurers, self-funded employer health benefits plans, or other entities that pay for prescription drugs on behalf of their members, insureds, or employees.

[10] *See Alabama Forest Products*, No. 2:04-cv-00711-SRW (M.D. Ala.), Dkt. 1 (Class Action Complaint) at 2, ¶ 4 (alleging diversity jurisdiction),  Dkt. 7-1 (Joint Motion to Stay Proceedings Pending Transfer to MDL), at 2 ("Plaintiff has filed a Notice of Related Action in the MDL proceeding."), Dkt. 8 (Order granting Joint Motion to Stay Proceedings Pending Transfer to MDL) (Walker, M.J.); *Gulf Distributing*, No. 1:04-cv-00403-WS-D (S.D. Ala.), Dkt. 1 (Class Action Complaint) at 3, ¶ 9 (alleging diversity jurisdiction), Dkt. 6-1 (Joint Motion to Stay Proceedings Pending Transfer to MDL) at 2 ("Plaintiff has filed a Notice of Related Action in the MDL proceeding."), Dkt. 7 (Order granting Joint Motion to Stay Proceedings Pending Transfer to MDL) (Steele, J.).

[11] Pfizer so heavily relies on *Alabama Forest Products* that it attaches to its Stay Motion a copy of Magistrate Judge Walker's Order granting the stay, and cites only to that Order in support

(continued...)

Pfizer also fails to mention that Harden Manufacturing Corporation filed a RICO class action in federal court in Boston, alleged federal question jurisdiction, and became the lead case in the Neurontin MDL.[12] Not surprisingly, Pfizer also ignores that, after a motion was filed with the MDL Panel to transfer various cases alleging off-label marketing of Neurontin, Judge Hodges, Chairman of the MDL Panel, sent a letter to district court judges with cases potentially subject to transfer, which provided as follows:

> Presently before the Panel pursuant to 28 U.S.C. § 1407 is a motion to transfer including at least one action before you in [MDL 1629 - In re Neurontin Marketing and Sale Practices Litigation]. The parties will have an opportunity to fully brief the question of transfer and the matter will be considered at a bimonthly Panel hearing session. The purpose of this letter is to apprise you of the effect of the pendency of the action before the Panel.  Panel Rule 1.5, 199 F.R.D. 425, 427 (2001), provides:
>
> > The pendency of a motion, order to show cause, conditional transfer order or conditional remand order before the Panel concerning transfer or remand of an action pursuant to 28 U.S.C. § 1407 does not affect or suspend
> orders and pretrial proceedings in the district court in which the action is pending and does not in any way limit the pretrial jurisdiction of that court.
>
> Thus your jurisdiction continues until any transfer ruling becomes effective. If you have a motion pending before you in the action – *particularly a motion to remand to state court (if the action was removed to your court) – you are encouraged to rule on the motion* unless you conclude that the motion raises issues likely to arise

---

[11](...continued)
of the following proposition: "A stay of proceedings by this Court would assist the Neurontin MDL to achieve its purpose of conserving judicial resources of forums around the county – including this one – and ensuring uniform decisions on any array of pretrial matters, *including remand motions*, while avoiding duplicative and costly burdens on the litigants." Stay Motion at 5 (emphasis added). Such reliance illustrates the desperate measures Pfizer is willing to take to delay remand of this case. *Alabama Forest Products* was filed originally in the Middle District of Alabama, so there was no remand motion in the case.

[12] *See Harden Mfg. Corp. v. Pfizer, Inc.*, No. 1:04-cv-10981-PBS (D. Mass.), Dkt. 1 (Class Action Complaint), at 7, ¶ 20 (alleging federal question jurisdiction based on RICO claims).

6

in other actions in the transferee court, should we order transfer, and would best be decided there.[13]

Pfizer knows full well that the MDL Panel encourages district courts to rule on motions to remand while cases are pending transfer to the Neurontin MDL, unless the Court concludes "that the motion raises issues likely to arise in other actions in the transferee court." *Id.* This follows from the requirement that a stay promote judicial economy. As Judge Steele of the Southern District of Alabama (who stayed *Gulf Distributing* when the parties jointly requested a stay and no jurisdictional issue was raised) recently held: "To defer ruling on a plainly meritorious motion to remand forces that body of seven judges [the MDL Panel] (who have their own dockets in addition to the Panel's) to needlessly review and hear argument on requests for transfer, objections thereto, and post-transfer matters. [Where] it is clear that the case must be remanded, every minute of time spent by the Panel on the case is wasted, guaranteeing that deferral results in a net loss of judicial economy." *Betts v. Eli Lilly & Co.*, 2006 WL 1523060, at *2 (S.D. Ala. Jun. 5, 2006).[14] "[E]ven when a jurisdictional issue is difficult, the transferor court should not automatically defer ruling but

---

[13] *Harden Mfg.,* No. 1:04-cv-10981-PBS (D. Mass.), Dkt. 4 (Letter from Wm. Terrell Hodges, Chairman, MDL Panel, dated June 9, 2004) (emphasis added).

[14] The district court in *Jackson v. Johnson & Johnson, Inc.*, 2001 WL 34049067 (W.D. Tenn. Apr. 3, 2001), upon which Pfizer relies, was not as concerned with the MDL Panel's time and energy. In fact, the court seemed to assume that Judge Fallon of the Eastern District of Louisiana , to whom the Propulsid MDL had been assigned by the MDL Panel, and not the MDL Panel itself, would determine "whether the case should become an MDL case." *Id.* at *6. The court had previously remanded the case to state court, *id.* at *1, and held that "if this case is not certified as an MDL case, the case will be remanded forthwith to the Circuit Court of Tennessee." *Id.* In other words, the court determined that it did not have jurisdiction, but stayed the case so that it could be transferred to the MDL, and Judge Fallon could also consider the motion to remand. There is clearly no judicial economy in such an outcome, which violated the very letter of 28 U.S.C § 1447 (c) ("If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded.") Reliance on *Jackson* is, at best, misplaced.

should first 'determine whether identical or similar jurisdictional issues have been raised in other cases that have been or may be transferred to the MDL proceedings.'" *Id.* at (quoting *Meyers v. Bayer AG*, 143 F. Supp. 2d 1044, 1049 (E.D. Wis. 2001)) *1 n.2.

In so holding, Judge Steele relied extensively on *Meyers v. Bayer AG*, 143 F. Supp. 2d 1044 (E.D. Wis. 2001), which is, ironically, cited by Pfizer in its Stay Motion at 9. In *Meyers*, the district court held: "The only reason to permit the [MDL] transferee court to decide the jurisdictional issue would be to further judicial economy and consistency. If the jurisdictional issue in the particular case is different from those in the other cases subject or potentially subject to MDL jurisdiction, these values do not come into play." *Id.* at 1049 (citing H.R.Rep. No. 90-1190).

The *Meyers* court also recognized that "[t]he *Manual for Complex Litigation (Third)* suggests that the transferee court should resolve motions to dismiss or to remand 'raising issues unique to the particular case' before the [MDL Panel] decides the motion to transfer. *Id.* (citing *Manual for Complex Litigation (Third)* § 31.131 at 252). "Only if the jurisdictional issue is both difficult and similar or identical to those in cases transferred or likely to be transferred should the court proceed to the third step and consider the motion to stay. But considering the motion to stay does not mandate that a stay should be granted; the factors to be considered include (1) the interests of judicial economy; (2) hardship and inequity to the moving party if the action is not stayed; and (3) potential prejudice to the non-moving party." *Id.* (citing *Rivers v. Walt Disney Co.*, 980 F. Supp. 1358, 1360 (C.D. Cal. 1997)).

Although not mentioned by Pfizer, the *Meyers* court went on to rule on the plaintiff's motion to remand, finding that diversity jurisdiction did not exist. *Id.* at 1050. The court found no weight in Defendants' argument that they would be "forced to litigate the same issue in multiple courts" if

the stay was not granted, because, as here, "the parties [had] fully briefed the remand issue before [the court]." *Id.* at 1053.

*Only* because the notice of removal was also based on federal question jurisdiction, the federal question issue was more difficult, *and* the federal question issue was likely to arise in eight other cases of which the court was aware, did the court reluctantly grant the motion to stay pending transfer to the MDL. *Id.* at 1053; 1048 ("Although *Landis* might be read to empower me to stay the case without making any effort to verify jurisdiction, I am, nevertheless, reluctant to do so."). Even then, the court's reluctance was overcome only because it had "no reason to believe that a ruling on the remand issue would be substantially delayed." *Id.* at 1053.

The present remand issues before the Court are both simple and unique. Under both *Betts* and *Meyers*, therefore, this Court should deny the motion to stay without weighing potential prejudice to the parties.

Despite Pfizer's attempts to convince this Court that this case is like all the others in the MDL, Pfizer cannot maintain that the issue before this Court *on remand* is like any other. Therefore, Pfizer's reliance on cases in which the issues on remand were likely to arise in other cases transferred to the MDL, is without merit. *See, e.g., In re Ivy*, 901 F.2d 7, 9 (2d Cir. 1990) ("The jurisdictional issue in question is easily capable of arising in hundreds or even thousands of cases in district courts throughout the nation."); *Moore v. Wyeth-Ayerst*, 236 F. Supp. 2d 509, 510-11 (D. Md. 2002) ("The court in MDL 1203 has also considered motions to remand similar to the motion before this court. Indeed, many of these motions involved the joinder of in-state pharmacies on claims similar to those alleged against [the pharmacy defendant]."); *Falgoust v. Microsoft Corp.*, No. 00-0779, 2000 WL 462919, at *1 (E.D. La. Apr. 19, 2000) ("[T]he same jurisdictional question raised in this case has

been raised before this court in another case against Microsoft, and will likely be raised in many of the other cases pending against Microsoft in other districts."); *Aikins v. Microsoft Corp.*, No. 00-2042, 2000 WL 310391, at *1 (E.D. La. Mar. 24, 2000) ("[T]he same jurisdictional questions raised here will likely be raised in many of the other cases pending against Microsoft.").

Where, like here, the issue on remand is unique to the case, district courts have held that a stay in particularly inappropriate. Indeed, in *Southern v. Pfizer Inc.*, No. 2:06-cv-00836-VEH, slip op. (N.D. Ala. Jun. 23, 2006) ("*Southern*, slip op."), upon which Pfizer inexplicably relies in its Stay Motion at 7,[15] the district court *denied* Pfizer's motion to stay ruling on remand, stating:

> Defendants invite the court to stay this case without reaching a decision on Plaintiff's Emergency Motion to Remand so that the instant motion may be decided by the MDL once the case is transferred. Such a course of action would be improper in that the parties are entitled to a determination of this court's jurisdiction as soon as is practicable. The interests of judicial economy, which the MDL has, in part, been established to preserve, are best served through a jurisdictional determination by this court at this time. Additionally, the facts which establish (or fail to establish) fraudulent joinder are likely to be unique to this case.

---

[15] Pfizer cites *Southern* and *Accetullo v. Pfizer Inc.*, No. 4:06-cv-00341-WRW (E.D. Ark.) for the following proposition: "Indeed, plaintiffs in the Neurontin litigation have already - and unsuccessfully - tried to name non-diverse sales representatives *or physicians* as defendants in an effort to defeat removal." Stay Motion at 7 (emphasis added). Yet, neither of these cases involved a defendant physician at all, much less a physician like Longmire, who assisted Pfizer in its fraudulent marketing scheme by promoting off-label use of Neurontin to prescribing physicians across the country. *See Southern*, slip op. at 5; *Accetullo,* No. 4:06-cv-00341-WRW (E.D. Ark.), Dkt. 2-1 Complaint), at 16 ¶ 87 ("Williams Lieblong [the only non-diverse defendant named], . . . was an employee and a sales representative for 'Pfizer' at all times material herein.").

*Southern*, slip op. at 3 n.2 (Exhibit A to Pfizer's Brief in Opposition to Remand, Dkt. 11-1)[16]; *see also Johnson v. Micron Technology, Inc.*, 354 F. Supp. 2d 736, 740 (E.D. Mich. 2005) (denying stay of ruling on remand pending MDL transfer where "the issue presented by this remand motion is unique to this case and does not involve questions of law and fact common to similar claims across the country."); *Board of Trustees of the Teachers' Ret. Sys. of Ill v. WorldCom, Inc.*, 244 F. Supp. 2d 900, 903 (N.D. Ill. 2002) (cited by Pfizer, Stay Motion at 8, but noting that "when remand motions in cases potentially subject to MDL consolidation raise unique issues of law or fact, channeling the decisions to a single court would result in little or no savings of judicial resources."); *Benjamin v. Bayer Corp.*, No. 02-0886, 2002 WL 1009475, at *1 (E.D. La. May 16, 2002) (cited by Pfizer, Stay Motion at 8, but noting that "there are numerous cases in districts throughout Louisiana alleging damages as a result of the ingestion of PPA in which the plaintiffs assert Louisiana redhibition claims against nondiverse retail sellers," *id.* at *1, the issue in plaintiffs' motion to remand in that case); *Bourdreaux v. Metro Life Ins. Co.*, No. 95-138, 1995 WL 83788, at *2 (E.D.

---

[16] That the district court in *Southern* stayed proceedings pending transfer to the Neurontin MDL following its denial of remand does nothing to support Pfizer's position here. Neither does *Aetna U.S. Healthcare, Inc. v. Hoechst Aktiengesellschaft*, 48 F. Supp. 2d 37 (D.D.C. 1999), cited by Pfizer for the proposition that "[c]ourts routinely grant stays pending transfer to an MDL in order to provide greater consistency in pretrial rulings." Stay Motion at 11 (citing *Aetna*, 48 F. Supp. at 43). In *Aetna*, the court stayed proceedings pending MDL transfer only *after* ruling on the plaintiff's motion to remand. *Aetna*, 48 F. Supp. at 38 n.1 ("[I]n the interest of judicial economy, the court will first consider whether this action should be remanded to Superior Court."). Similarly, in *Good v. Prudential Ins. Co. of America*, 5 F. Supp. 2d 804 (N.D. Cal. 1998), cited by Pfizer, Stay Motion at 11, the court stayed proceedings, *id.* at 809, only *after* ruling on the plaintiff's motion to remand. *Id.* at 806-809.

In the unlikely event that this Court denies the motion to remand, then the necessity of a stay pending transfer to the MDL Court could be addressed at that time. While this Court has discretion to stay this action, to stay a case prematurely constitutes an abuse of that discretion. *See Clinton v. Jones*, 520 U.S. 681, 708 (1997) (a case upon which Pfizer also inexplicably relies in its Stay Motion at 6).

La. Feb. 24, 1995) (cited by Pfizer, Stay Motion at 8, but noting that whether the plaintiffs' claims were time-barred, an issue "common in products liability cases such as this asbestos case," would determine whether the non-diverse defendant was fraudulently joined); *Johnson v. AMR Corp.*, Nos. 95-C-7659 - 95-C-7664, 1996 WL 164415, at *1 (N.D. Ill. Apr. 3, 1996) (cited by Pfizer, Stay Motion at 8-9, but noting that the allegedly fraudulently joined defendant, a citizen of Illinois, had been sued in many suits arising out of the crash of American Eagle Flight 3379 filed in the Cook County, Illinois Circuit Court).[17]

There is no way that the issues of Longmire's fraudulent joinder or realignment can arise in any other action in the MDL Court, or in any pending case that could be transferred there. To Plaintiffs' knowledge, Dr. Longmire has been sued in only one other case, and Pfizer has recently consented to remand of that case to state court, so it will not be before the MDL Court.[18]  As no one else appears to have sued Dr. Longmire or any other of Pfizer's marketer-doctors, the issue of

_____

[17] As mentioned earlier, there is a motion to remand pending before the MDL Court by the "Assurant Plaintiffs," a group of TPPs. However, that remand motion does not involve fraudulent joinder or diversity jurisdiction at all, but only federal question jurisdiction. *See Assurant Health, Inc. v. Pfizer, Inc.*, No. 2:05-cv-00095-JAP-MCA, Dkt. 1-1 (Notice of Removal) at 4 ("The Court has original jurisdiction over the action because: (a) the action is 'founded on a claim or right arising under . . . the laws of the Unites States.' 28 U.S.C. § 1331; and (b) the action [sic] "a civil action arising under an[] Act of Congress relating to patents.' 28 U.S.C. § 1338.").

It is also worthy of note that, although the MDL Panel stayed the CTO issued in the Assurant Plaintiffs' case after they filed a notice of opposition to transfer, the case was transferred to MDL 1629 without the Panel considering the merits of their opposition, because they failed to file a motion to vacate and supporting brief required by the MDL Rules.  *See id.,* Dkt. 17-2 (MDL Order Lifting Stay of CTO, dated 3/15/05).

[18] *Alabama Associated General Contractors, Inc. v. Pfizer, Inc.*, No. 2:06-cv-00523-MHT-VPM (M.D. Ala.), Dkt. 1, Ex. A (Complaint naming Longmire as Defendant); Dkt. 13 (Notice of Pfizer's Consent to Remand); Dkt. 14 (Order remanding action to Circuit Court of Montgomery County, Alabama).

Longmire's or any other marketer-doctor's fraudulent joinder or realignment cannot arise in the MDL. There can therefore be no judicial economy in staying ruling on Plaintiffs' Motion to Remand to State Court.

Even if the Court considered prejudice to the parties, it is clear that there is reason to believe that a stay of this action before ruling on motion to remand will have the result that Pfizer intends - to "enter[] some 'black hole,' never to be seen again." *In re Asbestos Prod. Liability Litig.*, 771 F. Supp. 415, 423 n.10 (J.P.M.L. 1991). Pfizer argues misguidedly that there would be no prejudice to Plaintiffs because any delay would be "short," Stay Motion at 12, implying that the potential issuance of a Conditional Transfer Order ("CTO") by the MDL Panel in "two to three weeks," *id.* at 4, is the end of the story. Yet, the issuance of the CTO is only the beginning of the delay Pfizer seeks.

Plaintiffs can assure this Court and Pfizer that they will oppose the transfer of this improvidently removed case to the MDL. According to the Rules of Procedure of the Judicial Panel on Multidistrict Litigation ("MDL Rules"), "[n]o transfer or remand determination regarding any action pending in the district court shall be made by the Panel when any party timely opposes such transfer or remand unless a hearing session has been held . . . ." MDL Rule 16.1(c). No hearing has been scheduled by the MDL Panel regarding the transfer of this action, and no hearing can be

anticipated until late September, at the earliest, and possibly mid-to-late November,[19] which is,

ironically, a direct result of Pfizer's unreasonable delay in filing the Notice of Related Action.[20]

---

[19] The MDL Panel held a hearing on motions in favor of and in opposition to transfer on July 27, 2006. *See* http://www.jpml.uscourts.gov/Hearing_Information/HearingOrder7-27-06.pdf (last accessed July 31, 2006) (Notice of Hearing Session dated 6/15/06). No Notice of Hearing Session for the Panel's next session has been issued yet, but historically the session following the July session is in late September, and the Notice of Hearing Session is issued at least six weeks in advance of the scheduled hearing. *See* http://www.jpml.uscourts.gov/Hearing_Information/ Hearing_Archives/hearing_archives.html (last accessed July 31, 2006) (MDL Panel Hearing Order Archives). The next Panel Hearing session is typically in mid-to-late November. *Id.* When the Panel issues its Notice of Hearing Session, it designates which matters are to be heard with and without oral argument. MDL Rules 16.1(a) & (d); *see, e.g.,* http://www.jpml.uscourts.gov/ Hearing_Information/HearingOrder7-27-06.pdf (last accessed July 31, 2006) (Notice of Hearing Session dated 6/15/06).

It is likely that this matter will not be fully briefed for hearing prior to a late September Panel Hearing Session. The Plaintiffs will have 15 days from the issuance of a Conditional Transfer Order ("CTO") to file their notice of opposition to transfer, MDL Rule 7.4(c), and another 15 days to file their Motion to Vacate the CTO and supporting brief. MDL Rule 7.4(d). Pfizer will then have 20 days to file its brief in opposition to the Motion to Vacate the CTO. MDL Rule 7.2(c), and Plaintiffs will have 5 days to file a reply brief in support of the motion. MDL Rule 7.2(d). Plaintiffs have not received a CTO as of this date, but Pfizer estimated on July 21, 2006, that the CTO may be issued "within the next two to three weeks." Stay Motion at 4. Assuming the CTO is issued on August 11 (three weeks from 7/21/06), the case would not be heard in late September because briefing would not be complete until 55 days following August 11, or October 5, 2006. This Court retains jurisdiction until which time that the Panel denies Plaintiffs' Motion to Vacate the CTO, and alerts the Clerk of the MDL Court of the denial. MDL Rules 1.5, 7.4(c) & (e). Even if this matter can be heard at the next Panel Hearing Session in late September, therefore, this Court will have jurisdiction over this case for at least two more months.

[20] The MDL Rules require that "[a]ny party or counsel in actions previously transferred under Section 1407 . . . *promptly* notify the Clerk of the Panel of any potential 'tag-along actions' in which that party is also named or in which that counsel appears." MDL Rule 7.5(e) (emphasis added). This case was filed in Montgomery County Circuit Court on May 12, 2006. Pfizer was served with the complaint on or about May 24, 2006, and removed the case to federal court on June 13, 2006. Yet, Pfizer did not notify the Clerk of the Panel that this case may be a potential "tag-along" action until July 20, 2006, almost two months after service and over a month after removal. This is not "prompt," and is further evidence of Pfizer's intent to delay consideration of plaintiffs' motion to remand this improvidently removed action.

Pfizer's reliance is misplaced on cases in which hearings before the MDL Panel regarding transfer were imminent. For instance, Pfizer cites to *Portnoy v. Zenith Labs*, No. 86-3512, 1987 WL 10236, at *1 (D.D.C. Apr. 21, 1987), Stay Motion at 5, 9 & 11, but does not disclose that, at the time the court was considering the stay motion, the case had already been set for hearing before the MDL Panel for one month following the entry of the stay. *Id.* at *1. Pfizer also cites to *American Seafood, Inc. v. Magnolia Processing, Inc.*, Nos. 92-1030, 92-1086, 1992 WL 102762 (E.D. Pa. May 7, 1992), Stay Motion at 9, without noting that a hearing on transfer was scheduled before the MDL Panel within 22 days. *Id.* at *1.[21] Similarly, Pfizer cites to *Tench v. Jackson Nat'l Life Ins. Co.*, No. 99-C-5182, 1999 WL 1044923 (N.D. Ill. Nov. 12, 1999), Stay Motion at 6 & 9, but fails to mention that the district court found no prejudice to the Plaintiff from the stay because the MDL Panel was to hear argument regarding transfer *within a week*. *Id.* at *2.

Pfizer also misleadingly cites to *Johnson v. Pfizer Inc.*, No. 05-3688 (E.D. La. Aug. 25, 2005),[22] Stay Motion at 5, *Fonseca v. Pfizer Inc.*, No. 7:05-cv-0312 (S.D. Tex. Oct. 21, 2005), Stay

---

[21] In addition, neither remand nor subject matter jurisdiction was at issue in *American Seafood*. The district court granted the stay because, not only was the MDL Panel scheduled to hear transfer motions scheduled 22 days after opinion staying action, *id.* at *1, but "any prejudice to the plaintiffs is clearly outweighed by the considerations of judicial economy and possible prejudice to the defendants. As of the date of this Memorandum, there are six pending motions which impact either substantive legal issues or the important procedural questions of class action certification. These issues should be addressed by the court to which all of the pending civil actions are assigned." *Id.* at *2. The present case, on the other hand, does not threaten such "duplicative motion practice and discovery in the absence of the stay," as Pfizer contends. Stay Motion at 9. Plaintiffs seek only for the Court to address its subject matter jurisdiction.

[22] In *Johnson*, Pfizer's motion to stay was filed August 22, 2005, *Johnson*, No.2:05-cv-03688-SSV-DEK (E.D. La.), Dkt. 7, and granted August 26, 2005, Dkt. 11, without any intervening opposition by the plaintiff.

Motion at 4, *Aranda v. Pfizer Inc.*, No. 05-309 (S.D. Tex. Oct. 17, 2005),[23] Stay Motion at 7-8, *King v. Merck* (C.A. No. 05-165 M.D. Ala.),[24] Stay Motion at 7, *Jones v. Merck & Co.*, No. 2:05-cv-00427-RDP (N.D. Ala.),[25] Stay Motion at 7, and *Faircloth v. Merck & Co.*, No. 2:06-cv-00184-RDP, Stay Motion at 10,[26] in which the plaintiffs *did not oppose the motions to stay*.[27]

Even more egregiously, Pfizer states unequivocally that in *Rivers v. Walt Disney Co.*, 980 F. Supp. 1358, 1360-62 (C.D. Cal. 1997), the court granted a stay "where remand motion was

---

[23] Although the motions to stay were styled as "opposed" motions in both *Fonseca*, No. 7:05-cv-0312 (S.D. Tex.), Dkt. 6, and *Aranda*, No. 7:05-cv-0309 (S.D. Tex.), Dkt. 6, no opposition was filed in either case. Plaintiffs in both cases merely filed motions for leave to amend their complaints. *Fonseca,* Dkt. 10; *Aranda*, Dkt. 10. In addition, Plaintiffs' briefs in support of motion to remand in both cases were stricken for failure to comply with local rules in filing. *Fonseca*, Dkt. 17; *Aranda*, Dkt. 17.

[24] In *King*, the Court ordered all parties to submit briefs in support of or in opposition to defendant's motion to stay by March 11, 2005. *King*, No. 2:05-cv-00165-MHT-VPM, Dkt. 11, but the plaintiff filed only a motion to amend the complaint, *id.*, Dkt. 13, and a motion to remand. *Id.*, Dkt. 14.

[25] In *Jones* the plaintiffs did, after failing to oppose the motion to stay, file a motion to reconsider the stay, but argued only generally that "the Order misapplied the applicable law and that an Order remanding this action back to the Circuit Court of Jefferson County, Alabama, is due to be entered." *Jones v. Merck & Co.*, No. 2:05-cv-00427-RDP (N.D. Ala.), Dkt. 20 (Plaintiffs' Motion to Reconsider Order Granting Defendant's Motion to Stay and Motion for Oral Argument) at 1-2.

[26] In *Faircloth*, the plaintiffs asked for reconsideration of the Order granting the stay, which they had not previously opposed, *see Faircloth*, No. 2:06-cv-00184-RDP, Dkt. (showing no opposition filed to motion to stay following motion, Dkt. 4, or prior to Order granting stay, Dkt. (unnumbered) dated 1/30/06), and for leave to conduct discovery to identify non-diverse defendants. *See* Stay Motion, Exhibit D (Order denying motion for reconsideration).

[27] Also, in *Mecija v. Pfizer Inc.*, No. SA CV 06-293 (C.D. Cal. Apr. 27, 2006), on which Pfizer relies, Stay Motion at 4, plaintiffs merely joined in a defendant's motion to remand and opposition to motion to stay. *Mecija*, 8:06-cv-00293-DOC-AN (C.D. Cal.), Dkt. 17 (Joinder in Opposition to Motion to Stay); Dkt. 18 (Joinder in Motion to Remand). Pfizer also cannot rely on *Young v. Pfizer Inc.*, No. 06-1308 (E.D. Pa. May 4, 2006), Stay Motion at 4, in which a motion to stay was filed before a motion to remand, unlike in this case. *See Young*, No. 2:06-cv-01308-BMS (E.D. Pa.), Dkt. 7 (Motion to Stay dated 4/5/06), Dkt. 8 (Motion to Remand dated 4/18/06).

pending and an MDL Court had not yet been selected in order to conserve judicial resources." Stay Motion at 9. There was *no remand motion pending* in *Rivers*; the class action race discrimination suit was filed by the plaintiffs in federal court. *Rivers*, No. 2:97-cv-01499-RSWL-VAP, Dkt. 1 (Complaint alleging federal question).  In fact, *the plaintiff* was seeking a stay pending a decision by the MDL Panel on transfer, and the defendants accused the plaintiffs of forum shopping. *Rivers*, 980 F. Supp. at 1361.  The court granted the stay, primarily because the case *did not* involve jurisdictional issues. *Id.* ("In the instant case, this Court does not need to resolve fundamental jurisdictional issues . . . ."). *See also Egon v. Del-Val Fin. Corp.*, No. 90-4338, 1991 WL 13726, at *1 (D.N.J. Feb. 1, 1991) (also cited by Pfizer, Stay Motion at 11, but in which no jurisdictional issue was raised); *Rosenfeld v. Hartford Fire Ins. Co.*, Nos. 88 CIV. 2153 (MJL), 88 CIV. 2252 (MJL), 1988 WL 49065, at *2 (S.D.N.Y. May 12, 1988) (also cited by Pfizer, Stay Motion at 12, but in which no jurisdictional issue was raised).

Suffice it to say, Pfizer has no basis on which to argue that this case should be stayed before ruling on remand. That it is desperate to delay this action from moving forward in state court (which, as discussed below, is inevitable), does not excuse the desperate measures taken in misleading and misguided citations to this Court. Plaintiffs urge the Court to deny Pfizer's Stay Motion and to consider Plaintiffs Motion to Remand immediately.

## II.    THIS COURT LACKS SUBJECT MATTER JURISDICTION

### A.    Facts Alleged and Evidence Submitted Establish Longmire's Role in the Neurontin Off-Label Marketing Scheme.

In May 2004, the United States Attorney for the District of Massachusetts charged Warner-Lambert Company LLC (referred to herein as Pfizer because Pfizer acquired Warner-Lambert

17

Company LLC in June 2000, Complaint ¶15) with Distribution of an Unapproved New Drug, in violation of 21 U.S.C. §§ 331(d), 333(a)(2) & 355(a), *see* Information (attached hereto as Exhibit A) at 13, and Distribution of a Misbranded Drug: Inadequate Directions for Use, in violation of 21 U.S.C. §§ 331(a), 333(a)(2) & 352(f)(1). *See* Information (Ex. A hereto) at 14. In the Information, the U.S. Attorney alleged that Pfizer "organized a consultant meeting at the Jupiter Beach Resort in Palm Beach, Florida on April 19-21, 1996. Approximately 42 physicians attended the meeting, including nine physicians who made presentations relating to Unapproved Uses of Neurontin." Information (Ex. A hereto) at 9, ¶ 25. One of the physicians making presentations at the Jupiter Beach conference was Defendant Longmire. Complaint ¶ 75.

"Among the presentations made to the physicians in attendance was one relating to Unapproved Uses entitled 'Reduction of Pain Symptoms During Treatment with Gabapentin.' In the meeting's agenda, this presentation was listed as 'Anticonvulsant Advances.' During this presentation, Neurontin was promoted for use in the treatment of pain." Information (Ex. A hereto) at 10 ¶ 27. In the Sentencing Memorandum of the United States (attached hereto as Exhibit B), the United States Attorney explained such a discrepancy between the agenda given to attendees and the material presented by the presenters, like Longmire, as follows: "In this manner, [Pfizer] concealed the off-label purpose of the meeting from the attendees in advance and from those not attending the meeting." Sentencing Memo (Ex. B hereto) at 36-37. Of course, Longmire, who was actually speaking to the Jupiter Beach attendees about off-label use of Neurontin for treating pain, would have known that the agenda did not fully disclose the purpose of the conference. After Longmire's presentation, "[Pfizer] told its employees that: '[t]he meeting was a great success and the participants were delivered a hard-hitting message about Neurontin.'" Information (Ex. A hereto) at 10 ¶ 29.

Attorneys from Davis Polk & Wardwell (the firm representing Pfizer in the Neurontin MDL), signed a Plea Agreement stating: "[Pfizer] expressly and unequivocally admits that it committed the crimes charged in the Information. [Pfizer] agrees that the facts set forth in the Information are true." Plea Agreement (attached hereto as Exhibit C) at 1.

Longmire admits in his First Amended Complaint against Pfizer ("Longmire Amended Complaint") that, in addition to Jupiter Beach, Florida, he also promoted off-label use of Neurontin in Phoenix, Buffalo, Dallas, Philadelphia, Boston, New York Pittsburgh, Long Island, Newark, and Franklin County, Alabama. *See* Longmire Amended Complaint[28] ¶ 30. Pfizer filed only Longmire's original Complaint, which did not include this admission, with its Notice of Removal in this case, but included the amended complaint when removing Longmire's case. *See supra* n.28. Pfizer's repeated criticism of Plaintiffs for referencing only the Jupiter Beach and Boston conferences in their Complaint is incredulous. *See* Defs. Opp. at 8, 10, 12.

Plaintiffs admit they only referenced the Jupiter Beach and Boston seminars in their initial Complaint against Longmire, but as noted in ¶ 74 of the Complaint, Plaintiffs could not possibly know all the events at which Longmire spoke without initiating the present lawsuit. Longmire's Amended Complaint, with which Pfizer was served, proves that Longmire's involvement in Pfizer's marketing scheme was vast.[29]

---

[28] *Longmire v. Pfizer, Inc.*, No. 3:06-cv-01160-TMP (N.D. Ala.), Dkt. 1 (Notice of Removal), Ex. A at 15-30 (Plaintiffs' First Amended Complaint). Exhibit A to Pfizer's Notice of Removal in Longmire's action is not separately paginated, and appears to include all documents filed in the Circuit Court of Franklin County, Alabama, before removal. The page references here are to the page numbers of the pdf of Exhibit A to the Notice of Removal contained in the ECF/CM docket.

[29] Plaintiffs recently learned that Longmire's role may have been even more extensive than promoting Neurontin for pain. In conjunction with his lawsuit, his attorneys issued a press release
(continued...)

Longmire admits in his affidavit offered to Pfizer for use in opposition to remand ("Longmire Affidavit") that he had "dealings regarding Neurontin" with Pfizer after he began "examining Neurontin's efficacy for treating pain-relate conditions," Longmire Affidavit (Ex. B to Defs. Opp., Dkt. 11), at ¶ 6, and that he performed services for Pfizer until at least 1998-1999. *Id.* ¶ 21. While he claims now to believe that "the research and consulting services [he] provided to [Pfizer] were lawful and proper," *id.* ¶ 7, he admitted less than three months ago that he questioned the legality and ethics of his giving presentations about off-label uses of Neurontin. Longmire Complaint (Ex. B to Notice of Removal, Dkt. 2-2), ¶ 23; Longmire Amended Complaint ¶ 27. While he claims now that the companies that contacted him to make presentations about off-label use of Neurontin were "independent medical education companies," Longmire Affidavit (Ex. B to Defs. Opp., Dkt. 11) ¶ 8, he admitted less than three months ago that it was Pfizer he called to discuss his participation in the presentations. Longmire Complaint (Ex. B to Notice of Removal, Dkt. 2-2), ¶ 22 ("[Pfizer] told Dr. Longmire that the lectures were intended to present early studies of the development of Neurontin for seizures to physicians who were not aware of the indications or methods of using Neurontin, and also told Dr. Longmire that he could speak about off-label uses of Neurontin where appropriate."); Longmire Amended Complaint ¶ 26 (same).

The only thing that has changed in the intervening three months is that Longmire has apparently struck a deal with Pfizer. *See* Defs. Opp. at 3 n.2 ("The Removing Defendants now believe Dr. Longmire's suit will soon be dismissed."). While Plaintiffs do not know the terms of

---

[29](...continued)
in which they admitted that Longmire had participated in "a deceptive scheme to market Neurontin for certain unapproved uses . . . includ[ing] post-herpetic neuralgia, painful diabetic neuralgia, anxiety disorder, social phobias, and bipolar disorder." Press Release (attached hereto as Exhibit F).

or circumstances surrounding such a deal, suffice it to say, there are certainly reasons to question the motives behind Longmire's self-serving testimony, not the least of which are the inconsistencies between his affidavit and complaints.[30]

Pfizer's argument that Plaintiffs cannot show that Longmire made misrepresentations upon which Plaintiffs relied to their detriment is similarly baseless. Longmire has been a Preferred Physician in Blue Cross's Preferred Medical Doctor ("PMD") Program since 1992. Declaration of Donna Harris Hill (attached hereto as Exhibit D) ¶ 5. As a PMD, Longmire agreed "to provide each Member [of Blue Cross] . . . the Medical Services for which benefits are provided by the Benefit Agreement under which the Member is covered only when and to the extent that such Services are Medically Necessary." *Id.* ¶ 5(b) (citing PMD Agreement (4/1/00) ¶ 4.3 (unchanged from 1994 to present)). The PMD Agreement that he entered into with Blue Cross provided that "Medically Necessary" meant that the services or supplies provided to the Member be: "(1) appropriate and necessary for the symptoms, diagnosis, or treatment of the Member's medical condition, and (2) provided for the diagnosis or direct care and treatment of the Member's medical condition, and (3) within standards of good medical practice accepted by the organized medical community, and (4) not primarily for the convenience of the Member, the Member's physician, or another provider of health services, and (5) the most appropriate supply or level of service which can safely be provided." *Id.* ¶ 5(a) (citing PMD Agreement (4/1/00) ¶ 2.6 (unchanged from 1994 to present)).

---

[30] Plaintiffs' counsel questioned Longmire's and Pfizer's counsel regarding any agreement to indemnify, defend, or otherwise hold Longmire harmless in Plaintiffs' action against Longmire, but Defendants' counsel would not answer the question. In the event that his Court finds Pfizer's removal anything but improvident, particularly Pfizer's realignment argument, Plaintiffs would seek leave to conduct discovery on this issue.

Longmire further agreed "to make no charge for Medical Services except to the extent permitted by this Agreement and the Member's Benefit Agreement." *Id.* ¶ 5(c) (citing PMD Agreement (4/1/00) ¶ 4.5 (unchanged from 1994 to present)). Pfizer is aware of the language in this PMD Agreement because it received it in response to a subpoena in the *Harden Manufacturing* case in the Neurontin MDL, *id* ¶ 3, 5.

Longmire knew that the PMD Agreement "incorporates the terms of the 'Members' Benefit Agreement," *id.* ¶ 7, which provides that Blue Cross does not pay for "investigational" drugs. *Id.* Pfizer is also aware of the "investigational" drug provision because the Harden Manufacturing benefit agreement was produced to it pursuant to the same subpoena. *Id.* ¶ 10.

"Investigational" means:

Any treatment, procedure, facility, equipment, drugs, drug usage, or supplies either not recognized by Blue Cross as having scientifically established medical value or not in accordance with generally accepted standards of medical practice.

Blue Cross' determination of whether a particular treatment, procedure, facility, equipment, drug, drug usage or supply is "investigational" will be made on the basis of the following criteria:

The technology or treatment must have final approval from the appropriate government regulatory bodies for the specific use for which it is prescribed or used;

The scientific evidence must permit conclusions concerning the effect of the technology or treatment on health outcomes;

The technology or treatment must improve the net health outcome;

The technology or treatment must be as beneficial as any established alternatives;

The improvement must be attainable outside the Investigational setting;

22

Classification by Medicare;

Classification by the Blue Cross and Blue Shield Association.

*Id.* ¶ 7 (citing 1994 to 1997 Harden Manufacturing Benefit Agreement); *see also* ¶¶ 8-9 (subsequent years using similar language). "All Benefits Agreements for plans administered and/or insured by Blue Cross during the time periods referenced above for the Harden Benefit Agreement, contained the same or substantially similar coverage exclusions and definitions of "investigational." Therefore, any Benefit Agreement for a person covered by Blue Cross or a self-funded plan administered by Blue Cross from 1994 to 2005 would have excluded coverage for investigational drugs, including off-label uses for Neurontin that were not recognized as having scientifically established medical value, or that did not meet generally accepted standards of medical practice." *Id.* ¶ 11.

Therefore, Longmire knew the extent to which Blue Cross would pay for Neurontin, and knew – or clearly should have known – that Blue Cross would not have paid for Neurontin under the circumstances he was promoting to physicians both inside and outside Alabama. This policy applied to plans insured by Blue Cross and to self-funded plans administered by Blue Cross, like Harden Manufacturing. Therefore, Longmire knew – or again should have known – that TPPs like MWCF would have similarly refused to pay for Neurontin if they had known that it was be promoting by Pfizer through Longmire for off-label uses for which it was not medically necessary. *See* Roper Affidavit (attached hereto as Exhibit E) ¶ 5.

Both Plaintiffs submit herewith their sworn testimony that Longmire is sued because Plaintiffs believe he committed the acts of which he accused in Plaintiffs' Complaint, that he was responsible for their injury, and that the action against Longmire was not brought simply to defeat diversity jurisdiction. Hill Declaration (Ex. D hereto) ¶ 4; Roper Declaration (Ex. E hereto) ¶ 3. In

23

fact, Blue Cross intends to terminate the PMD Agreement with Longmire upon entry of judgment in its favor, which it is entitled to do pursuant to its PMD Agreement. Hill Declaration (Ex. D hereto) ¶ 6 ("Committing fraud against Blue Corss is a ground for immediate termination of the PMD Program."). "Since 1994, Blue Cross has paid for Neurontin prescribed by Longmire to persons covered by Blue Cross and/or self-funded plans administered by Blue Cross." *Id.* ¶ 12. "From 1994 to 2001, the total number and dollar amounts of Neurontin prescriptions paid by Blue Cross jumped dramatically," and "Blue Cross believes this jump to be as a result of the illegal marketing and promotion schemes of Pfizer and Longmire." *Id.* ¶ 13.

After having a business relationship with Longmire since 1992, and paying for Neurontin he prescribed since 1994, Blue Cross learned of Pfizer's scheme after the Information and Plea Agreement discussed above became public. After learning that one of their own PMDs was so heavily involved in this illegal and fraudulent scheme, Blue Cross brought this action against Longmire. His inclusion as a Defendant was certainly not to defeat diversity.

As a PMD Longmire was familiar with how claims are processed by Blue Cross and other health plans, and would have certainly known that health plans cannot verify every detail of every claim to determine that the claim is not being submitted as a result of fraud. Blue Cross processes an average of 2.5 million claims for prescription drugs each month. Hill Declaration (Ex. D hereto) ¶ 14. MWCF processes thousands of drug claims each month. Roper Declaration (Ex. E hereto) ¶ 4. When paying claims for prescription drugs, Plaintiffs must assume and rely on the fact that the physician is prescribing drugs legally and without illegal influence from drug companies and/or persons, like Longmire, acting on their behalf. Hill Declaration (Ex. D hereto) ¶ 14; Roper Declaration (Ex. E hereto) ¶ 4. To do otherwise would not be economically feasible. *Id.*

Longmire and Pfizer knew this and exploited it. Indeed, the scheme's success depended completely on doctors like Longmire promoting Neurontin, and entities like Plaintiffs paying for it. For Longmire to claim that he did not know that he would cause harm to Plaintiffs when he, on behalf of Pfizer, encouraged doctors to prescribe more Neurontin for off-label use, is absurd.

Yet, in an attempt to further distort Longmire's role in the off-label marketing scheme, Pfizer wrongly asserts that the MDL Court recently held that the MDL plaintiffs had failed to allege sufficiently that the physicians shared a common purpose with the other purported RICO participants." Stay Motion at 10 n.1 (citing *In re Neurontin*, Civ. A. No. 04-10981, 2006 WL 1594082 (D. Mass. June 12, 2006)). This is simply not true. In fact, at several points in its opinion on motion to dismiss, the MDL Court found specifically that plaintiffs had sufficiently alleged that the doctors assisting Pfizer in the peer-to-peer marketing part of the scheme had "an unlawful common purpose . . ., namely, to illegally promote off-label uses of Neurontin." *In re Neurontin Marketing, Sales Practices, and Prod. Liability Litig.*, No. 04-10981-PBS, MDL 1629 (D. Mass. Jun. 12, 2006) ("*In re Neurontin*"), 2006 WL 1594082, at * 4.

In addressing the adequacy of the MDL complaints regarding the physicians' membership in the alleged RICO enterprise, the MDL Court held: "A common purpose is a necessary but not a sufficient condition for pleading a RICO enterprise, for 'something more must be found - something that distinguishes RICO enterprises from *ad hoc* one-time criminal ventures.'" *Id.* at * 5 (quoting *United States v. Cianci*, 378 F.3d 71, 82 (1st Cir. 2004)). While the MDL Court ultimately held that the MDL plaintiffs had not adequately alleged facts to conclude that the physicians were part of a RICO enterprise, the MDL Court clearly recognized that the allegations regarding the physicians, like Longmire, established, contrary to Pfizer's assertion, that the physicians and Pfizer shared a

25

common purpose.  The MDL Court further held that it "need not weigh in on whether a RICO

enterprise's common purpose must be illegal, because in this case, the alleged common purpose of

promoting off-label uses of Neurontin violated the law . . . ." *Id.* at  *5.

### B.     Longmire is Not Fraudulently Joined

#### 1.     Pfizer's Reliance on *Legg v. Wyeth* is Misplaced.

Pfizer again cites *Legg v. Wyeth*, 428 F.3d 1317 (11th Cir. 2005),[31] claiming it to be

controlling in the present case.  In their initial Motion to Remand, Plaintiffs noted *Legg* was not

particularly instructive, let alone authoritative.  Pfizer's continued reliance on *Legg* is misguided at

best, and is an attempt to mislead the Court at worst.  *Legg* is distinguishable on three compelling

bases from this case and thus should have no impact on this Court's decision on remand.

First, Pfizer is wrong that Legg sets out the controlling standard in this Circuit for evaluation

of fraudulent joinder claims.  Pfizer claims that *Legg* establishes a new standard to be applied in

fraudulent joinder cases, i.e., that  Pfizer is required to simply prove there is "no reasonable

possibility" of Plaintiffs' success on any claim against Longmire.  *See* Defs. Opp. at 7 (citing *Legg*,

428 F.3d at 1324).  This is not the Eleventh Circuit standard for evaluating fraudulent joinder.  *Legg*

---

[31] In *Legg*, Plaintiffs filed suit against Wyeth, a non-resident defendant, and three of its
resident sales representatives, claiming that Wyeth's diet drugs had caused injuries to the plaintiff's
heart.  Wyeth removed the action, claiming that the resident sales representatives were fraudulently
joined.  In support of removal, Wyeth submitted an affidavit in which a sales representative testified
that she had no knowledge that the diet drugs could cause heart damage.  The plaintiff failed to rebut
the testimony, but the district court refused to consider the affidavits, remanded the case to state
court, and awarded fees and costs to the plaintiff.  *Legg*, 428 F.3d at 1319.  The Eleventh Circuit held
that the district court should have considered the affidavits.  *Id.* at 1323.  In so holding, the Eleventh
Circuit stated in dicta that the affidavit testimony was undisputed.  *Id.* at 1323-25.  The court
concluded, therefore, that attorneys' fees and costs should not have been awarded against Wyeth for
the removal.  *Id.* at 1325.  The court was careful to note that it was not ruling on the propriety of the
remand.

26

did not even decide issues of fraudulent joinder or remand, like the present case presents to this Court. *Id.* at 230. *Legg* involved solely the standard for granting a motion for fees and costs on an improvident removal. *Id.* at 1325. Hence, any language in *Legg* relative to fraudulent joinder or remand proceedings is dicta, and should not be given weight by this Court.

The Eleventh Circuit has very recently again made clear the standard this Court must follow in assessing the merits of Pfizer's fraudulent joinder argument at this remand stage, and it is not a "no reasonable possibility" standard. *Henderson vs. Washington National Insurance Co.*, WL 1867353 (11th Circuit July 7, 2006). In *Henderson*, an Alabama insured filed suit in state court against an insurer, an Illinois corporation, another Indiana corporation, and an Alabama resident, alleging fraud. *Id.* at *1. The two corporate defendants removed the case, alleging fraudulent joinder of the Alabama resident. *Id.* The insured moved to remand and the United States District Court for the Northern District of Alabama denied the motion to remand. *Id.* Holding the insured had presented at least ***some*** possibility her claims were viable under applicable Alabama state law[32] against the resident defendant, the Eleventh Circuit reversed and remanded the case. Id.

In so doing, the Eleventh Circuit stated the applicable standard to follow in assessing fraudulent joinder at the remand stage:

> Our task is not to gauge the sufficiency of the pleadings in this case. Our inquiry is more basic: we must decide whether the defendants have proven by clear and convincing evidence that no Alabama court could find this complaint sufficient to invoke Ala.Code § 6-2-3. *Henderson's patchy allegations may ultimately prove insufficient, but we are unable to say there is no possibility she has asserted a colorable claim for tolling under Ala.Code § 6-2-3, whether or not pleading fraudulent concealment is required.*

---

[32] The Eleventh Circuit was determining whether or not the insured had properly pled fraudulent concealment under Alabama's fraud statute. *Id.* at *5.

*Id.* at *6 (emphasis added).

With *Henderson* as a compass, the standard this Court is to apply regarding fraudulent joinder is unambiguous: there must be a showing by Pfizer with clear and convincing evidence that there is "no possibility" Plaintiffs could assert a colorable claim against Longmire in an Alabama court. *See id.* This is true whether or not Plaintiffs can be successful or have a winning case. *See Triggs v. John Crump Toyota*, 154 F.3d 1284, 1287 (11th Cir. 1998). Pfizer has not, and cannot, meet this heavy burden. It is no wonder Pfizer relies exclusively on *Legg* in their Opposition to Plaintiffs' Motion to Remand.

Second, in *Legg* the Eleventh Circuit found the sales representatives had acted as innocent conduits of information for Wyeth, not as active participants in the fraud perpetrated on the plaintiff and his physician. *Id.* at 1324.[33] The *Legg* court placed significant weight on that fact in rendering its ultimate decision. In contrast, in the present case Longmire actively participated, and in fact, specifically was hired to aggressively promote Neurontin for illegal off- label uses. In addition, (a) Longmire knew Neurontin was not approved by the FDA for the treatment of pain (Longmire Amended Complaint ¶¶ 11, 17); (b) he knew that Pfizer had not applied to the FDA for such approval (*id.*); and (c) he questioned whether such an arrangement was legal and ethical (*id.* ¶¶ 22-24).

Defendants attempt to fit this "square peg" case into its "round hole" interpretation of *Legg*. Such an analysis is untenable. This is not a personal injury case where the plaintiffs have attempted to name a non-diverse company agent in an attempt to destroy diversity. In the present case,

---

[33] The Court also noted that no proof was presented that the drug representatives "promoted" the drug Redux. *Id.* at 1322 n. 4.

Defendant Longmire *actively* and *aggressively* promoted Neurontin for illegal off-label uses. He played an active part in speaking and writing on the topic to change prescription patterns of physicians in Alabama and around the country. *See* Longmire Amended Complaint ¶¶ 29-31. In addition, he was active in publishing articles and/or developing grants for actuarial studies on co-morbid or neuropathic pain related to Neurontin, an illegal off-label use of the drug. *See id.* ¶¶ 22-24.

It cannot be disputed that Longmire was aggressive and active in promoting the drug Neurontin for illegal off-label uses all over the country, and was not an "innocent conduit" as the pharmaceutical representatives were found to be in *Legg*. Indeed, Judge Saris, the Neurontin MDL judge, has found that physicians, including Longmire and others, shared a common purpose with Pfizer, i.e., the illegal promotion of off-label uses of Neurontin. *See In re Neurontin*, 2006 WL 1594082, at *5. Unlike the pharmaceutical representatives in *Legg* who were nothing more than conduits for illegal conduct, Longmire is neck deep in the illegal conduct in the present case. Pfizer must hope that wrapping this case in *Legg* will hide that issue from this Court.

Third, the *Legg* Court goes out of its way to stress that the sales representatives' affidavits were undisputed. Such point was made by the *Legg* court to further establish the innocent nature of the pharmaceutical representatives' actions. In the present case, however, the self-serving declaration of Longmire – used by Pfizer to bolster its fraudulent joinder argument in the Opposition to Remand – is in fact disputed.

The thrust of Longmire's Declaration is he did not directly speak to, with, or promote Neurontin for off label uses to Plaintiffs in the present case. *See* Longmire Affidavit ¶¶ 10-18. Nowhere does he say, or can he say, his illegal off-label promotion did not change prescription

patterns of doctors that ultimately caused damage to Plaintiffs, however.  In fact, as noted in his

Amended Complaint filed against Pfizer, he spoke to *Alabama doctors* in 1998 during an off-label

seminar on Neurontin. *See* Longmire Amended Complaint ¶ 30.  Longmire fails to mention that he

spoke to Alabama doctors in his affidavit, even though he goes out of his way to mention he has

never spoken with Plaintiffs.  *See* Longmire Affidavit ¶¶ 10-16.  Without doubt, the intent of his

1998 Alabama meeting was to assist Pfizer in promoting Neurontin for off-label uses. As the MDL

Court has correctly held, such conduct is illegal  2006 WL 1594082, at *5.

Further, Longmire's Declaration is now contradicted, unlike those of the sales representatives

in *Legg*. *See* Hill Declaration (Ex. D hereto) and Roper Declaration (Ex. E hereto).  These

declarations directly contradict the self-serving statements made by Defendant Longmire wherein

he stated "I never intended for any statements I made at such speaking engagements or at any other

time to influence the coverage decisions of any third-party payors for prescription medications,

including BCBS and MWCF."  See Longmire Affidavit ¶ 19.  As noted by Plaintiffs in their

declarations, such actions by Longmire did in fact influence their decisions to pay for the off-label

prescription of Neurontin. Moreover, Longmire has admitted that he understood the purpose of his

lectures for Pfizer to be to increase physician's awareness of off-label uses of Neurontin. Longmire

Amended Complaint ¶ 26. As stated by the Massachusetts U. S. Attorney, the first harm – indeed,

the intended harm – from Longmire's marketing was to health benefits payers, including Plaintiffs.

Sentencing Memorandum (Ex. B hereto) at 42-43.

The present case is simply not at all like *Legg*.  Defendants have not proved with any

evidence, much less clear and convincing evidence, that Plaintiffs have "no possibility" of recovery

against Longmire on any claim in Alabama state court. Plaintiffs' Motion to Remand to State Court is therefore due to be granted.

### 2.    Plaintiffs Have Adequately Alleged Reliance and Causation

Contrary to Pfizer's assertions, Plaintiffs can be successful in a claim for fraud even though they did not physically hear the misrepresentations made by Longmire.  Alabama law addresses this point as follows:

> The general rule is that a deceit must be practiced directly on the person injured, but Thomas argues that this Court has previously expanded a person's standing to sue to include representations that were not made directly to the person who sues. Thomas cites *National States Ins. Co. v. Jones,* 393 So.2d 1361 (Ala.1980), where this Court held that a niece had standing to sue, even though the representation was not made to her, but to her aunt, since deceased. While generally "[a] stranger to a transaction . . . has no right of action [for fraud]" there is an exception to this general rule: "***If a third person is injured by the deceit, he may recover against the one who made possible the damages to him by practicing the deceit in the first place.***" 37 C.J.S. *Fraud* § 60, p. 344 (1943), *See Sims v. Tigrett,* 229 Ala. 486, 158 So. 326 (1934). ***In Alabama, it is not always necessary to prove that a misrepresentation was made directly to the person who claims to have been injured.***

*Thomas v. Halstead*, 605 So. 2d 1181, 1184 (Ala. 1992)(emphasis added).[34]

---

[34] *Thomas* is damaging to Defendants' position (i.e., Plaintiffs could not have "relied" on Longmire's misrepresentations).  Hence, they attempt in their Opposition to minimize *Thomas* by stating "[e]ven in the cases where third-parties have been allowed to bring fraud claims, courts have found that the defendant must have intended to induce the third-party to rely on the deception . . . Dr. Longmire . . . never contemplated nor intended that Alabama insurers would be induced to make insurance coverage decisions based on statements in those lectures." *See* Defs. Opp. at 11-12; *see also* Longmire Affidavit ¶ 19.  Plaintiffs respectfully submit that such a reading into *Thomas* is contrary to the ultimate holding.  The holding of Thomas is fundamental: "it is not always necessary to prove that a misrepresentation was made directly to the person who claims to have been injured." *Id.* at 1184.  That is especially true in cases where, as here, a third person is the target of the fraud. *See id.*  Allowing Defendants to limit the holding of *Thomas* in this case would allow them to get away with misrepresentations to a third-party by simply submitting a self-serving affidavit from a co-conspirator simply claiming that he never intended the misrepresentations to induce Plaintiffs to pay for off label prescriptions. Where, as here, Plaintiffs were the target of the marketing efforts, such an outcome would be unjust.

(continued...)

Plaintiffs need not show they directly heard the statements from Longmire at various off-label conferences to state a viable claim against him for fraud). Under Alabama law, if Plaintiffs can establish they were injured by the deceit/fraud, and particularly where they are the targets and victims of the scheme, they state a claim against Longmire.

In the present case, Plaintiffs clearly show they were damaged by the deceit/fraud engaged in by Longmire. The off-label promotion scheme pled by Plaintiffs was, in part, carried out through physicians, like Defendant Longmire. *See* Complaint ¶¶ 3, 6. But for the actions of physicians, like Longmire, Plaintiffs would not have been required to pay for a substantial amount of off-label prescriptions of Neurontin. *See* Complaint ¶ 189. The focus of the illegal scheme was clearly to make money (through payments for the drug). *See* Complaint ¶¶ 46 - 47. Plaintiffs paid millions in illegal off-label prescriptions for Neurontin.

When paying for prescriptions, Plaintiffs assumed "that physicians are prescribing prescription drugs legally and without illegal influence from drug companies and/or persons acting on their behalf." *See* Hill Declaration (Ex. D hereto) ¶¶14-15; Roper Declaration (Ex. E hereto) ¶¶ 4-5. When paying claims for Neurontin, Plaintiffs "had no reason to believe that physicians prescribing Neurontin for off-label uses were being influenced to do so by Pfizer and Longmire . . . ." *See id.* In short, Plaintiffs "relied" on physicians, like Defendant Longmire, to follow the law,

---

[34](...continued)

Longmire did in fact induce BCBS and MWCF to change prescription habits. *See* Declarations, Exhibit E ¶ 5; see also Exhibit D ¶ 15. This should not be news to Defendant Longmire. He even questioned whether or not his conduct was illegal or unethical when he was speaking all over the country on the illegal off label marketing of Neurontin. *See* Longmire Amended Complaint, ¶ 27. For Longmire to now say he did not intend to induce Plaintiffs into action is absurd. The intent of the illegal off label scheme, as pled in the Complaint, was to make money. Unfortunately, BCBS and MWCF were two victims of the scheme that made money for Defendants, including Defendant Longmire.

to only prescribe drugs that were "medically necessary," and to not market drugs for drug companies. Longmire's actions, particularly those in the State of Alabama, make clear that there is more than a possibility that Plaintiffs can show that Longmire's role in the fraudulent scheme caused them significant damage, notwithstanding they did not hear such statements. There is no doubt Plaintiffs have established at least a possibility of success on their claim for fraud.

### 3.    Judge Saris Has Repeatedly Ruled Plaintiffs Can Establish Causation.

Pfizer again claims that causation cannot be proven in this case. Judge Saris has repeatedly ruled againt Pfizer on this point, perhaps prompting Pfizer's Freudian slip of a false charge against Plaintiffs that "the fraudulent joinder is a new twist on a previously unsuccessful effort." Defs. Opp. at 3.  In the whistleblower case against Pfizer, the relator, a former Pfizer employee and medical liaison, Dr. Franklin, alleged that Pfizer's illegal use of physicians such as Longmire to market Neurontin off-label was for the purpose of increasing the number of off-label prescriptions written for Neurontin and caused false claims to be submitted for reimbursement to the government under the Medicaid program.  Pfizer phrased this argument, as here, in terms of causation.

Thus, on motion to dismiss, addressing the causation requirement, Judge Saris reviewed the relator's claim that "Parke-Davis [now Pfizer] has caused the submission of numerous off-label prescriptions for Neurontin to the Medicaid program through both its fraudulent statements about the safety and efficacy of Neurontin and its system of unlawful financial incentives and kickbacks to doctors who prescribe Neurontin." *US ex rel. Franklin v. Parke-Davis*, 147 F. Supp. 2d 39, 51 (D. Mass. 2001).  Rejecting Pfizer's present argument, she ruled "in this case, when all reasonable inferences are drawn in favor of the Relator, the participation of doctors and pharmacists in the submission of false Medicaid claims was not only foreseeable, it was an intended consequence of

the alleged scheme of fraud." *Id.* at 52-53 (D. Mass. 2001) (rejecting Pfizer's argument also made here that the Relator had failed to allege the fraudulent scheme to increase the submsission of false claims to Medicaid for reimbursement with particularity.)

Again, on motion for summary judgment, Judge Saris found:

[P]arke-Davis [now Pfizer] misstates the legal standard for causation. The FCA [False Claims Act] does not provide a special definition for causation … Absent an FCA-specific definition of causation, the Court will apply common-law tort causation concepts, which Judge Campbell of the First Circuit has summarized: Causation in tort law is generally divided into two concepts: causation in fact, or actual causation, and proximate of legal causation. *See* W.Page Keeton et al., *Prosser & Keeton on Torts*, 41-42 (5th ed. 1984). The terms for these two concepts are sometimes confused, as are the concepts themselves. Regardless of the terminology, however, there are two questions that must be answered to determine if a defendant's conduct "caused" a plaintiff's injury. The first question is whether there was in fact some causal relationship between the conduct and the outcome. The *Restatement* expresses this test as whether the defendant's conduct was a 'substantial factor' in producing the harm. *Id.* The second question is whether the circumstances and causal relationship are such that the law will impose liability on the defendant. Sometimes this is expressed as a foreseeability test, *see* Keaton, *supra*, 42 at 273. *Cf. Restatement (Second) of Torts* 431(b) (1965) (different terminology).

*US ex rel. David Franklin v. Parke-Davis,* 2003 WL 22048255 (D. Mass.) (Aug. 22, 2003) at *4.

Applying both concepts of causation, Judge Saris ruled against Pfizer: "whether Parke-Davis's conduct was a substantial factor in causing the presentation of false Medicaid claims is a question of fact." *Id.* at 5. As to proximate or legal causation, she noted that she had "already held that Parke-Davis could have foreseen false Medicaid claims being filed, even with the intervening links in the causal chain." *Id.* "Relator has provided evidence that Parke-Davis's actions were not irrelevant, but played a key role in setting in motion a chain of events that led to false claims." *Id.* at 6.

The same principles apply with equal force to the common law causes of action pled by

Plaintiffs here.  Plaintiffs' allegations that Longmire participated with Pfizer in a fraudulent scheme to increase the submission and payment of off-label claims for Neurontin to them more than meets both actual and legal causation standards.   Indeed, it is impossible to say that  Pfizer has met its heavy burden of proving that there is no possibility that Plaintiffs have stated the causation element of the common law torts alleged by Plaintiffs in this  case.

**C.      Longmire is Not Due to be Re-Aligned as a Plaintiff in This Case.**

Pfizer all but abandons its previous re-alignment argument, noting that it "believe[s]  Dr. Longmire's suit [against Pfizer] will soon be dismissed." Defendants' Opposition to Plaintiffs' Motion to Remand at 3 n.2. ("Defs. Opp.").[35] Whether or not Dr. Longmire's suit against Pfizer is dismissed, it borders on the ridiculous for Pfizer to maintain that Plaintiffs are not adverse to Longmire in this lawsuit.   Lest there be any doubt, Longmire's Affidavit in this action, baldly claiming he has done nothing wrong, puts the true adversity of his interests to those of the Plaintiffs, who say he has done something wrong, in stark relief.

Plaintiffs have sued Longmire and Pfizer on the basis of their joint liability as co-conspirator tortfeasors in the illegal promotion of Neurontin.  Pfizer deliberately misses this point, claiming  that Plaintiffs have simply "mislabel[ed] ... an individual physician as a 'defendant' in this case." Defs.' Opp. at 22. Longmire is not sued as an individual treating physician, but as a co-promoter and co-conspirator with Pfizer.

Contrary to Pfizer, and as discussed in Plaintiffs' Motion to Remand, such claims are quite

---

[35]Plaintiffs have reason to believe that Defendant Longmire's defense is being provided by Pfizer,. whether by reservation of rights or indemnity, and intend to seek discovery on this point.

common sensibly held not to permit re-alignment of a co-conspirator defendant as a plaintiff.[36]  Not surprisingly, Pfizer fails to address the controlling and persuasive caselaw cited by Plaintiffs on this point.[37]

Nor does Pfizer, as it claims, rebut the cases refusing to re-align a defendant as a plaintiff simply because it has a cross-claim against another defendant.  Typically, Pfizer simply ignores the

---

[36]*East Tennessee, V & JG.r Co. v. Grayson,* 119 U.S. 240, 7 S.Ct. 190, 30 L.Ed. 2d 382 (1886) (claims of conspiracy and collusion between resident and non-resident defendant prevented re-alignment of stockholder with company);  *Schetter v. Heim,* 300 F. Supp. 1070 (E.D. Wis. 1969) (claims of conspiracy to defraud prevented re-alignment of wife with husband); *Alexander v. Washington,* 274 F.2d 349, 350 (5th Cir. 1960) (re-alignment proper because insane person could not conspire).

[37]Despite failing to discuss **any** of these cases, and trumpeting that Plaintiffs' claim as to conspiracy re-alignment "is directly rebutted by caselaw," Pfizer cites not **one** case involving a re-alignment where the plaintiff had brought a conspiracy claim against the re-aligned party.  Defs. Opp. at 23 n.10.  Instead, Pfizer merely rehashes its original argument, relying on cases previously distinguished by Plaintiffs as involving both claims and a legal relationship such as a principal/surety with an identity of interest between the parties re-aligned very different from that here.  *Premier Holidays International v. Arctrade Capital, Inc.,* 105 F. Supp. 1336 (N.D.Ga. 2000) (no conspiracy claim; breach of contract action between plaintiff principal and its surety and fraud claim by plaintiff against third party; surety realigned as plaintiff on breach of contract claim since that was "threshold issue of liability" and if plaintiff principal prevailed, it did as well); *USF & G v. Algernon-Blair, Inc.,* 705 F. Supp. 1507, 1513 (M.D. Ala. 1988) (no conspiracy claim; contractor's surety filed suit against its principal, the contractor, and the owner of an apartment complex seeking declaratory relief; state court action between contractor and owner with claims and counterclaims for fraud and breach of contract; principal re-aligned as plaintiff since primary dispute was breakdown of contractual relationship and, if surety prevailed, so did principal); *Boland v. State Aut. Mut. Ins. Co.,* 144 F. Supp. 2d 1282 (M.D. Ala. 2001) (no conspiracy claim; breach of contract and declaratory judgment action; held that mortgagor and mortgagee have same interest in dispute with insurer had obligation to provide coverage for damage to property where mortgagee was loss payee; re-alignment proper, if mortgagor prevailed on claim against insurer, so did mortgagee).; *Indemnity Ins. Co. v. First Nat. Bank at Winter Park, Fla.,* 35F.2d 521 (5th Cir. 1965) (no conspiracy claim, re-aligned an insurer and an insured in a declaratory action with a defendant bank which was claimed to be primarily liable on improperly cashed checks); *Jordan v. Marks,* 147 F.2d 800, 802 (5th Cir. 1945) (property owners who acquired title from previous owner accused of fraud aligned with him to protect their identical interests in the property).

cases cited by Plaintiffs on this point.[38]

*Indemnity Ins. Co. v. First Nat. Bank at Winter Park, Fla.,* 35F.2d 521 (5th Cir. 1965)*,* cited

by Pfizer, in fact supports Plaintiffs.  In that case, a declaratory action was brought by the insurer,

Indemnity, of a bank, Winter Park, which had issued cashiers' checks which were in turn accepted

by another bank Sanford Atlantic, with either forged or absent signatures. In its insurer's declaratory

action, Winter Park counterclaimed against its insurer and cross-claimed against Sanford Atlantic.

In re-aligning the insured with its insurer, the court noted: "We are unable to find any substantial

difference between the positions of Winter Park and Indemnity. The only contention made by

Indemnity as to a controversy with its insured, the Winter Park bank, was that the bank had not

sustained a loss as of the date of the trial against the policy insured.  Restating this position of

Indemnity, it urges it would not be liable on the policy until its insured's loss has been established."

 Thus, if Winter Park prevailed, so did Indemnity, and there was no "bona fide controversy" between

Indemnity and Winter Park.

Instead, this case is more like  *Zurn Industries, Inc. v. Acton Const. Co., Inc.,* 847 F.2d 234

(5th Cir. 1988).   In *Zurn,* the Fifth Circuit reversed the district court for re-aligning the parties in

a subcontractor's suit against a Texas city, the design engineer, and the general contractor for extra

work done by the subcontractor on the city's sewage treatment plant.

---

[38] *Belcher v. Birmingham Trust National Bank,* 348 F. Supp. 61, 79 (N.D. Ala. 1968) (cross-claims by defendant related to "transactions and occurrences upon which plaintiff relies" did not require re-alignment); *Scott v. Fancher,* 369 F.2d 842, 845 (5th Cir. 1966) (cross-claim did not require re-alignment, plaintiff charged both defendants with negligence, claim was not baseless at time it was made, no re-alignment because co-defendant counterclaimed and cross-claimed on grounds he was not liable); *Correspondent Services Corp. v. First Equities Corp of Florida,* 338 F.2d 119, 124 (2d Cir. 2003) (crossclaim; no realignment); *Faysound Limited v. United Coconut Chemicals,* 878 F.2d 290, 295 - 96 (9th Cir. 1989) (no re-alignment); *Mellon Bank v. Poling,* 2004 WL 1535799 at *4-5 (no re-alignment).

The district court realigned the parties according to what it viewed as the two
"primary" claims.  The court took all of the various claims, including the
counterclaims and cross-claims and determined which two were the "primary"
claims.  Joining of all the claims and deciding which are the "primary" claims is not
warranted by *City of Indianapolis [v. Chas Nat'l Bank,* 314 U.S. 63, 62 S.Ct. 15, 86
L.Ed. 47 (1941)]. The objective of *City of Indianapolis* is only to insure that there is
a *bona fide* dispute between citizens of different states. 314 U.S. at 69, 62 S.Ct. at 17.
The determination of the "primary and controlling matter in dispute" does not include
the cross-claims and counterclaims filed by the defendants. Instead, it is to be
determined by plaintiff's principal purpose for filing its suit. ...

The principal claim here is Zurn's claim for almost $900,000 for extra work. That
claim continues to exist.  It is a *bona fide* claim, as all parties admit, not just asserted
to create federal jurisdiction. On that claim, none of the defendants should be
realigned under *City of Indianapolis.* Zurn has a legitimate dispute with URS [design
engineer], Garland [the City] and Acton [the general contractor]. The fact that Zurn
is on the same side as Acton and URS on Garland's cross-claims and counterclaims
is of no consequence to jurisdiction over the original claim.

847 F.2d at 237.

This case is not, then, as Pfizer seeks to muddy the waters, a declaratory judgment action

involving identical claims against a third party of a surety and a principal, or an insurer and its

insured, or a mortgagor and a mortgagee, or successors in title.  If Longmire prevails in his claim

against Pfizer that it duped him into participating in its illegal marketing scheme, it does not at all

follow that Plaintiffs prevail in their suit against Pfizer and Longmire for conspiring to establish and

participate in the scheme.  Likewise, if Plaintiffs prevail in their suit against Pfizer it does not follow

that they will prevail against Longmire.  There is indeed a *bona fide* controversy between Plaintiffs

and Longmire as to Longmire's liability for his actions in conspiring to and promoting the off-label

use of Neurontin.  This Court should reject Pfizer's arguments to the contrary.

WHEREFORE, Plaintiffs respectfully request that this Court deny Pfizer's Stay Motion

and remand this action to the Circuit Court of Montgomery County, Alabama for lack of subject

38

matter jurisdiction.

Respectfully submitted,

/s/ Pamela B. Slate
Pamela B. Slate (ASB-8938-A43P)
pslate@slatekennedy.com
Slate Kennedy LLC
166 Commerce Street, Suite 350
Montgomery, Alabama 36104
Phone: (334) 262-3300
Fax:    (334) 262-3301

OF COUNSEL:

Kimberly R. West (ASB-2419-E65K)
kw@wallacejordan.com
Wallace, Jordan, Ratliff & Brandt, LLC
P.O. Box 530910
Birmingham, Alabama 35253-0910
Phone:(205) 870-0555
Fax:    (205) 871-7534

Joshua J. Wright (ASB-4891-W51J)
joshw@hollis-wright.com
Hollis & Wright, P.C.
505 North 20th Street, Suite 1750
Birmingham, AL  35203
Phone:(205) 324-3600
Fax:    (205) 324-3636

## CERTIFICATE OF SERVICE

I hereby certify that on July 31, 2006, I electronically filed the foregoing with the Clerk of the  United States District Court, Middle District of Alabama, using the CM/ECF system, which will send notification of such filing to the following:

*Counsel for Pfizer Inc., Warner-Lambert Company,*
*Warner-Lambert Company LLC and Parke-Davis,*
*a division of Warner Lambert Company LLC and*
*Warner-Lambert Company*:
Andrew Burns Johnson, Esquire
Brian A. Wahl, Esquire
Fred M. (Tripp) Haston, III, Esquire
Bradley Arant Rose & White LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, Alabama 35203-2104

*Counsel for David Longmire*:
Bruce F. Rogers, Esquire
Charles K. Hamilton, Esquire
Bainbridge, Mims, Rogers & Smith, LLP
The Luckie Building, Suite 415
600 Luckie Drive
Post Office Box 530886
Birmingham, Alabama 35253

s/ Pamela B. Slate
Pamela B. Slate (ASB-8938-A43P)
pslate@slatekennedy.com
Slate Kennedy LLC
166 Commerce Street, Suite 350
Montgomery, Alabama 36104
Phone: (334) 262-3300
Fax:    (334) 262-3301
