IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| BLUECROSS AND BLUESHIELD<br>OF ALABAMA; MUNICIPAL<br>WORKERS' COMPENSATION<br>FUND, INC., | ) <br>) <br>) <br>) <br>) | |
| Plaintiffs, | ) <br>) | CIVIL ACTION NO.<br>2:06-cv-00524-MEF-VPM |
| v. | ) <br>) <br>) | |
| PFIZER, INC., WARNER-<br>LAMBERT COMPANY LLC;<br>WARNER-LAMBERT COMPANY;<br>PARKE-DAVIS, A DIVISION OF<br>WARNER-LAMBERT COMPANY<br>AND WARNER-LAMBERT<br>COMPANY LLC; DAVID<br>LONGMIRE, | ) <br>) <br>) <br>) <br>) <br>) <br>) <br>) <br>) <br>) | |
| Defendants. | ) | |

## DECLARATION OF DONNA HARRIS HILL

Donna Harris Hill states as follows:

1.      I am a resident of Alabama over the age of 21, and an Associate Counsel in the

Legal Division of Blue Cross and Blue Shield of Alabama ("Blue Cross"). Based on a review of

Blue Cross's business records and my experience with Blue Cross over the past five (5) years, I

have personal knowledge of the facts set forth herein, and could testify competently thereto if

sworn as a witness.

2.      I am familiar with the allegations made in the Complaint filed against Pfizer Inc.,

Warner-Lambert Company LLC, Parke-Davis, a Division of Warner-Lambert Company and

Warner-Lambert Company LLC (collectively "Pfizer"), and David Longmire ("Longmire") in the Circuit Court of Montgomery County, Alabama, on May 12, 2006, which action was removed to the Middle District of Alabama on or about June 13, 2006.

3.    I am also familiar with the allegations made in the Complaint filed against Pfizer, Inc. in the case of Harden Manufacturing Corporation v. Pfizer, Inc., et al., MDL Docket No. 1629, Master File No. 04-10981 in the United States District Court for the District of Massachusetts.  Under my direction and supervision, Blue Cross, the administrator of the Harden Manufacturing Corporation plan, has responded to extensive third-party document subpoenas from Pfizer in that case.  As a result, I am personally familiar with these documents which are business records of Blue Cross.

4.    I submit this Declaration in support of Plaintiffs' Motion to Remand to State Court and testify unequivocally that Blue Cross firmly believes that Longmire, in his role as a promoter on behalf of Pfizer of off-label uses for Neurontin, committed fraud against Blue Cross, conspired with Pfizer and others to defraud Blue Cross and other third-party payers ("TPPs"), private and public, and violated other Alabama laws referenced in the Complaint, including violations of the Alabama Deceptive Trade Practices Act.  Blue Cross did not bring this action against Longmire to prevent diversity jurisdiction.

5.    Longmire has been a Preferred Physician in Blue Cross's Preferred Medical Doctor ("PMD") Program since 1992.  I have reviewed the PMD Agreements to which Longmire would have been subject from 1994 to the present.  A copy of the present Agreement, effective 4/1/2000, the relevant terms of which have not substantially changed since 1994, was provided to Pfizer as Ala. Bates Number 461 – 482, and I attach it hereto as Ex. A.  Under these Agreements, as a Preferred Physician Longmire agreed to the following terms:

a.    "'Medically Necessary' or 'Medical Necessity' means when services or supplies provided or to be provided to a Member under the provisions of this Agreement are determined to be: (1) appropriate and necessary for the symptoms, diagnosis, or treatment of the Member's medical condition, and (2) provided for the diagnosis or direct care and treatment of the Member's medical condition, and (3) within standards of good medical practice accepted by the organized medical community, and (4) not primarily for the convenience of the Member, the Member's physician, or another provider of health services, and (5) the most appropriate supply or level of service which can safely be provided."    PMD Agreement ¶ 2.6 4/1/00 (unchanged from 1994 to present).

b.    "Physician agrees to provide to each Member . . . the Medical Services for which benefits are provided by the Benefit Agreement under which the Member is covered only when and to the extent that such Services are Medically Necessary." PMD Agreement (4/1/00) ¶ 4.3 (unchanged from 1994 to present).

c.    "Physician agrees to make no charge for Medical Services except to the extent permitted by this Agreement and the Member's Benefit Agreement." PMD Agreement (4/1/00) ¶ 4.5 (unchanged from 1994 to present).

6.    Committing fraud against Blue Cross is a ground for immediate termination of the Preferred Medical Doctor Program. PMD Agreement (4/1/00) ¶ 11.4 (found in 11.3(ii) in 1994 Agreement; unchanged from 1997 Agreement). Upon entry of judgment for Blue Cross against Longmire, if not before, Blue Cross intends to terminate the PMD Agreement.

7.    As noted above, the PMD Agreement incorporates the terms of the "Members' Benefit Agreement." Blue Cross provided administrative services for Harden Manufacturing Corporation ("Harden") from 1994 to the present. During that time, the Benefit Agreement for

Harden from 1994 to 1997, excluded coverage for "investigational treatment, procedures, facilities, drugs, drug usage, equipment or supplies," in the section entitled "Exclusions from Coverage." In a different definitional section, "investigational" was defined as follows:

> Any treatment, procedure, facility, equipment, drugs, drug usage, or supplies either not recognized by Blue Cross as having scientifically established medical value or not in accordance with generally accepted standards of medical practice.
>
> Blue Cross' determination of whether a particular treatment, procedure, facility, equipment, drug, drug usage or supply is "investigational" will be made on the basis of the following criteria:
>
> > The technology or treatment must have final approval from the appropriate government regulatory bodies for the specific use for which it is prescribed or used;
> >
> > The scientific evidence must permit conclusions concerning the effect of the technology or treatment on health outcomes;
> >
> > The technology or treatment must improve the net health outcome;
> >
> > The technology or treatment must be as beneficial as any established alternatives;
> >
> > The improvement must be attainable outside the Investigational setting;
> >
> > Classification by Medicare;
> >
> > Classification by the Blue Cross and Blue Shield Association.

8.      Similarly, from 1998 to 2002, "investigational" was defined as "[a]ny treatment, procedure, facility, equipment, drugs, drug usage, or supplies that either we have not recognized as having scientifically established medical value, or that does not meet generally accepted standards of medical practice."

9.      From 2003 to 2005, the Harden Benefit Agreement defined "investigational" as:

> Any treatment, procedure, facility, equipment, drugs, drug usage, or supplies that either we have not recognized as having scientifically established medical value, or that does not meet generally accepted standards of medical practice. When possible, we develop written criteria (called medical criteria) concerning services or supplies that we consider to be investigational. We base these criteria on peer-

- 4 -

reviewed literature, recognized standards of medical practice, and technology assessments. We put these medical criteria in policies that we make available to the medical community and our members. We do this so that you and your providers will know in advance, when possible, what we will pay for. If a service or supply is considered investigational according to one of our published medical criteria policies, we will not pay for it. If the investigational nature of a service or supply is not addressed by one of our published medical criteria policies, we will consider it to be non-investigational only if the following requirements are met:

> The technology must have final approval from the appropriate government regulatory bodies;

> The scientific evidence must permit conclusions concerning the effect of the technology on health outcomes;

> The technology must improve the net health outcome;

> The technology must be as beneficial as any established alternatives; and,

> The improvement must be attainable outside the investigational setting.

It is important for you to remember that when we make determinations about the investigational nature of a service or supply we are making them solely for the purpose of determining whether to pay for the service or supply. All decisions concerning your treatment must be made solely by attending physician and other medical providers.

10.     Documents reflecting these provisions of the Harden Benefits Agreement were produced to Pfizer on December 12, 2005, Bates No. Ala. 0001 – 0235, pursuant to the above-referenced subpoena served on Blue Cross in the case filed by Harden in federal court in Boston.

11.     All Benefits Agreements for plans administered and/or insured by Blue Cross during the time periods referenced above for the Harden Benefit Agreement, contained the same or substantially similar coverage exclusions and definitions of "investigational." Therefore, any Benefit Agreement for a person covered by Blue Cross or a self-funded plan administered by Blue Cross from 1994 to 2005 would have excluded coverage for investigational drugs, including off-label uses for Neurontin that were not recognized as having scientifically established medical value, or that did not meet generally accepted standards of medical practice.

12.    Since 1994, Blue Cross has paid for Neurontin prescribed by Longmire to persons covered by Blue Cross and/or self-funded plans administered by Blue Cross.

13.    From 1994 to 2001, the total number and dollar amounts of Neurontin prescriptions paid by Blue Cross jumped dramatically. Blue Cross believes this jump to be as a result of the illegal marketing and promotion schemes of Pfizer and Longmire.

14.    When paying claims for prescription drugs, Blue Cross must assume and rely on the fact, until alerted otherwise, that the physician is prescribing prescription drugs legally and without illegal influence from drug companies and/or persons acting on their behalf. It is not economically feasible for Blue Cross to investigate the circumstances surrounding each claim for reimbursement or payment for prescription drugs before paying the claim. Blue Cross processes an average of 2.5 million claims for prescription drugs each month. The administrative cost of cross-referencing each prescription drug claim with a diagnosis code, identifying prescriptions for off-label use, and determining whether each such prescription meets the definition of an investigational drug would be astronomical.

15.    When paying claims for Neurontin, Blue Cross had no reason to believe that physicians prescribing Neurontin for off-label uses were being influenced to do so by Pfizer and Longmire, until learning of the criminal plea in which Pfizer pled guilty to charges that Warner-Lambert, Parke-Davis had illegally marketed Neurontin for off-label uses through various means, including paying doctors to assist in influencing physicians to prescribe Neurontin for off-label uses for which it was not medically necessary. Because this information was not made known to Blue Cross earlier, it paid substantially more for Neurontin than it would have paid, but for Pfizer's illegal marketing and Longmire's success in illegally influencing physicians on Pfizer's behalf.

Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury under the law of the United States of America that the foregoing is true and correct.

Executed on July 31, 2006.

Donna Harris Hill
Associate Counsel
Blue Cross and Blue Shield of Alabama

# EXHIBIT A



# PMD

# Preferred Medical Doctor Program



PREFERRED MEDICAL DOCTOR PROGRAM

Table of Contents

PREFERRED MEDICAL DOCTOR AGREEMENT

ARTICLES:                                                                PAGE

   I.   Recitals and Purposes                                          2

  II.   Definitions                                                    2

 III.   Relationship Between Corporation, Physician, and Members       4

  IV.   Physician Services and Responsibilities                        5

   V.   Corporation Services and Responsibilities                      8

  VI.   Payment and Billing                                           11

 VII.   Utilization Review                                            15

VIII.   Dispute Resolution                                            18

  IX.   Records                                                       20

   X.   Marketing                                                     20

  XI.   Term and Termination                                          21

 XII.   General Provisions                                            22

EXHIBITS

Exhibit A.    Fee Schedule Amounts
              Anesthesia Reimbursement and Notes

Exhibit B.    Outpatient Diagnostic Workup Global Fee Schedule
              Addendum to Exhibit B

Exhibit C.    Outpatient Diagnostic Workup Criteria

Exhibit D.    Diagnoses Requiring Preadmission Review and Certification

Exhibit E.    Office Surgery Procedures

Exhibit F.    Outpatient Surgery Procedures

Exhibit G.    Second Opinion Surgical List

Exhibit H.    Incentive Office Surgery Procedures

Exhibit I.    Precertified Procedures

Exhibit J.    Concurrent Utilization Review Program (CURP) Hospitals

Exhibit K.    In-Office Physician Clinical Laboratory Guidelines

Exhibit L.    Global Case Rate Reimbursement for Radiation Oncology Services

PREFERRED MEDICAL DOCTOR AGREEMENT

WITH

BLUE CROSS AND BLUE SHIELD OF ALABAMA
AS AMENDED THROUGH APRIL 1, 2000

This Preferred Medical Doctor Agreement is effective on the date stated in the Application referred to and incorporated as a part of this Agreement between the Physician who completed and signed the Application ("Physician") and Blue Cross and Blue Shield of Alabama ("Corporation"), as parties to this Agreement.  In consideration of the mutual covenants and promises recited herein, the parties agree as follows:

I.  RECITALS AND PURPOSES

    1.1    Physician is licensed under Alabama law (or other states, if applicable) to provide health care services through the practice of medicine.

    1.2    Corporation is an Alabama not-for-profit health care service corporation, organized and licensed under Alabama law to enter into agreements with employers and other organizations for provision of health care services and to enter into contracts with physicians and other health care providers to provide those services.

    1.3    Physician and Corporation have mutual interests in promoting the ability of the health care system to continue to provide quality health care to the public despite the increasing costs of health care.  They therefore enter into this Agreement toward the ends of delivering and financing quality medical care through an arrangement (the "Preferred Medical Doctor Program") for the provision of such care through less costly means to members of the public choosing medical benefits through that arrangement.  The objective of this Agreement accordingly is the prospective financing of broad benefits of quality medical care at a lower cost to the public for medical services that both are medically necessary and are provided in the least costly setting consistent with the needs of patients for quality medical care.

    1.4    In furtherance of the above-stated objective, it is the purpose of Corporation under this Agreement to afford to members of the public the "Preferred Medical Doctor Program" in order to promote the public interests stated above, and it is the purpose of Physician hereunder to provide medical services in accordance with the "Preferred Medical Doctor Program" in order to promote the public interests stated above.

II.   DEFINITIONS

    2.1    "Agreement" means this Agreement, which includes the Physician's Application incorporated herein by reference, the Exhibits attached hereto and all modifications and updates of them, and all Amendments to this Agreement.

    2.2    "Benefit Agreement" means the written agreement entered into by Corporation with a group or organization or person under which Corporation provides, indemnifies against, or administers health care benefits covered under Corporation's Preferred Medical Doctor Program.

    2.3    "Emergency" means a sudden onset of a medical condition manifesting itself by acute symptoms of sufficient severity that the absence of

2

immediate medical attention could reasonably result in:

(1) permanently placing the Member's health in jeopardy,
(2) causing other serious medical consequences,
(3) causing serious impairment to bodily function, or
(4) causing serious and permanent dysfunction of any bodily organ or part.

2.4    "Fee Schedule" means the schedule of medical procedures and fee amounts for such procedures as established by Corporation under the Preferred Medical Doctor Program which is on file at Corporation's offices, and includes fee amounts and procedures as established, updated, and adjusted pursuant to Section 6.5, 6.6, and 6.7. Exhibit A to this Agreement is a partial listing of said Fee Schedule containing those medical procedures more commonly performed and the fee amounts for them. "Fee Schedule" does not include the Outpatient Diagnostic Workup Global Fee Schedule as defined in Section 2.9.

2.5    "Hospital Services" means those acute care inpatient and outpatient hospital services for which benefits are provided by the applicable Benefit Agreement.

2.6    "Medically Necessary" or "Medical Necessity" means when services or supplies provided or to be provided to a Member under the provisions of this Agreement are determined to be:

(1) appropriate and necessary for the symptoms, diagnosis, or treatment of the Member's medical condition, and
(2) provided for the diagnosis or direct care and treatment of the Member's medical condition, and
(3) within standards of good medical practice accepted by the organized medical community, and
(4) not primarily for the convenience of the Member, the Member's physician, or another provider of health services, and
(5) the most appropriate supply or level of service which can safely be provided. For hospital stays, this means that acute care as an inpatient is necessary due to the kind of services the Member must receive or the severity of the Member's condition, and that safe and adequate care cannot be received as an outpatient or in a less intensified treatment setting.

2.7    "Medical Services" mean those medical and surgical services rendered to a Member by Physician for which benefits are provided by the Benefit Agreement under which the Member receiving those Services is enrolled.

2.8    "Members" mean Subscribers and their enrolled dependents covered under a Benefit Agreement for benefits under the Preferred Medical Doctor Program through which the Subscribers and dependents are encouraged (and in some instances, may be required) to use the services of Preferred Physicians.

2.9    "Outpatient Diagnostic Workup Global Fee Schedule" means the list of maximum global fee amounts payable under Section 6.1.b for cognitive professional services of Physician in the diagnosis of the symptoms listed in the Schedule. Exhibit B to this Agreement is the Global Fee Schedule for such cognitive services. "Outpatient Diagnostic Workup Global Fee Schedule" does not include the Fee Schedule as defined in Section 2.4.

2.10   "Preferred Medical Doctor Program" means a program designed and promoted to (I) further the interests of the public on obtaining quality health

3

care in the least costly setting consistent with a patient's condition, (ii) achieve the objectives of Physician and Corporation to provide health care at lesser costs, (iii) encourage Members to utilize Preferred Physicians while preserving to them the right to choose any physician, and (iv) to pay Preferred Physicians on a fee-for-service basis for Medically Necessary services that are appropriate to the needs of Members for quality medical care.

2.11    "Preferred Physician" means a physician who has entered into a Preferred Medical Doctor Agreement with Corporation to provide Medical Services as a participating physician in the Preferred Medical Doctor Program.

2.12    "Subscribers" mean persons who are eligible for, enrolled under, and covered by the terms and conditions of a Benefit Agreement.

2.13    "Utilization Review" means the review and determination of whether Hospital Services or Medical Services which have been or are to be provided to a Member, and which are covered services, are Medically Necessary. Some examples are determinations of whether a particular hospital admission, length of hospital stay, outpatient care, or diagnostic services are necessary and appropriate for a Member's medical condition.

2.14    "Preferred Medical Laboratory" means a medical laboratory which has entered into an agreement with Corporation to provide laboratory services to Members.

2.15    "Preferred Radiology Provider" means a Physician or group of Physicians who have entered into a Preferred Radiology Services Agreement with Corporation.

2.16    "Preferred Outpatient Facility" means a facility which has entered into a Preferred Outpatient Facility contract with Corporation.

2.17    "InfoSolutions®" means the patient medical database established and maintained by the Corporation.

III.    RELATIONSHIP BETWEEN CORPORATION, PHYSICIAN, AND MEMBERS

3.1    Physician and Corporation are independent legal entities. Nothing in this Agreement shall be construed or be deemed to create between them any relationship of employer and employee, principal and agent, partnership, joint venture, or any relationship other than that of independent parties contracting with each other solely to carry out the provisions of this Agreement for the purposes recited in Article I.

3.2    It shall be the right and responsibility solely of Physician to create and maintain a physician/patient relationship with each Member that Physician treats, and Physician shall be solely responsible to each Member for all aspects of medical care and treatment within the scope of Physician's professional license, including the quality and levels of such care and treatment.

3.3    It shall be the responsibility solely of corporation to Members for the creation and maintenance of the Member/Corporation relationship with each Member, and Corporation shall be solely responsible for matters relating to the handling and processing of claims payments for Medical Services and the premium billing and coverage of Members under Benefit Agreements.

4

3.4     Consistent with Section 3.2 and 3.3 above and the other provisions of
        this Agreement, neither party will be required to assume or bear any of
        the responsibilities, or any consequences thereof, of the other party
        under this Agreement.  Neither Physician nor Corporation nor any of
        their respective agents or employees shall be responsible to other
        persons (except for assignments permitted by Section 12.1) for any act
        or omission of the other party in performance of their respective
        responsibilities under this Agreement.

3.5     Physician's right to recommend or advise patients on the choice of, or
        to otherwise select, hospitals, outpatient centers or other health care
        facilities, or specialists, consultants, or other health care service
        providers in the treatment of patients shall not be restricted by this
        Agreement.  However, Physician is  required to refer patients to other
        Preferred Physicians or Preferred Providers except where Physician, in
        accordance with standards of good medical practice, believes that the
        patient's medical condition warrants referral to another physician or
        provider.  The referral reimbursement policy is determined by the
        Corporation and the terms and provisions of the Members Benefit
        Agreement.  Coverage by Corporation of the services of such other
        providers will be dependent upon and subject to the terms and provisions
        of the particular Benefit Agreement under which the Member is covered.

3.6     No provision of this Agreement shall require Physician to enter into or
        continue a physician/patient relationship with any Member.


IV.    PHYSICIAN SERVICES AND RESPONSIBILITIES

4.1     Physician agrees to provide Medical Services to Members in accordance
        with this Agreement.

4.2     Physician agrees to maintain in good standing all licenses required by
        law including the license to practice medicine in the State of Alabama
        (or other states, if applicable).

4.3     Physician agrees to provide to each Member, in a non-discriminatory
        manner, the Medical Services for which benefits are provided by the
        Benefit Agreement under which the Member is covered only when and to the
        extent that such Services are Medically Necessary.  Except as otherwise
        provided by this Agreement, such Services will be provided to each Member
        in the same manner and in accordance with the same standards as for other
        patients of Physician.

4.4     Physician agrees to accept as payment in full for all Medical Services
        the fee amounts set forth in Article VI.

4.5     Physician agrees to make no charge for Medical Services except to the
        extent permitted by this Agreement and the Member's Benefit Agreement.
        Physician may waive a particular copayment or co-insurance amount for
        reasons of professional courtesy or because the patient is perceived as
        unable to pay.  With these exceptions, Physician must bill the Member
        for any copayment and co-insurance amounts applicable under the Member's
        Benefit Agreement to Medical Services provided by Preferred Physicians,
        but the total amount payable by both the Member and Corporation shall
        not exceed the amount payable under Article VI for such Medical
        Services.  If Physician, except in cases of professional courtesy or
        inability to pay, does not bill the Member for any copayment and/or co-
        insurance amounts applicable under the Member's Benefit Agreement or if
        Physician does not make a reasonable good faith effort to collect such

5

billed amounts, or <u>if</u> Physician waives or represents that he waives such amounts, then Physician has breached this Agreement and may be terminated under Section 11.3. Physician may bill the Member for physician services which are not covered under the Member's Benefit Agreement because of exclusions and limitations in the Benefit Agreement (typical examples being services for experimental or investigative treatment, cosmetic surgery, pre-existing conditions, and routine office check-ups). However, in order for the Physician to bill the Member for physician services which either (I)are not covered under the Member's Benefit Agreement, or (ii)which are determined in accordance with Articles VII and VIII to be not Medically Necessary, the Physician must notify the Member in writing that the services are not covered and the Member must nevertheless agree with Physician in writing to be responsible for payment of charges for each such service. Such notification is required for each patient encounter.

4.6     Physician has accurately completed the Preferred Physician Application which is incorporated by reference as a part of this Agreement. Physician will promptly notify Corporation of any change in the information contained on the Application, including any change of principal place of business, within thirty (30) days of such change.

4.7     Physician agrees that Members will be provided Medical Services in the most efficient manner and setting consistent with the medical needs and condition of Members and, toward that end, that such Services will be provided in accordance with the provisions of Article VII.

4.8     Physician agrees to complete and file on a timely basis all claims for benefits for Medical Services rendered to Members, using either a claim form designated by Corporation or alternative electronic claims submission media ("alternate billing") in a format specified by Corporation, including all applicable procedure and diagnosis codes and Physician's charges usually and customarily billed for such Medical Services.

4.9     Physician agrees that, in the event through error or mistake of Corporation, Physician, or any other person or entity, Corporation makes any payment to Physician for services to a Member which is not due to be paid under this Agreement and the applicable Benefit Agreement, Physician at Corporation's request will refund such payments to Corporation or will, at Physicians option, permit any sums paid in error or mistake to be deducted from any sums payable to Physician under this Agreement for services furnished to that or any other Member.

4.10    Physician agrees to refer Members to a Preferred Radiology Provider or a Preferred Outpatient Facility for performance of certain diagnostic imaging procedures for which an agreement exists between Corporation and such Preferred Providers unless Physician, in accordance with standards of good medical practice, believes that the patient medical condition requires referral to another radiology provider. Initially such procedures will consist of all diagnostic procedures which are benefits under Members' Benefits Agreements and which are performed through use of a computerized axial tomography or magnetic resonance imaging device. Corporation shall notify Physician through advance written bulletin of the addition of any other such imaging procedures subject to this Section and of the identity of Preferred Radiology Providers and Preferred Outpatient Facilities.

4.11    Physician shall not bill the Member for any service that is billed separately, but bundled with and reimbursed by the Corporation under

another CPT code.

4.12    Physician understands that the successful development and refinement of the Program is a continuing coordinated effort between Physician, Corporation, and the Members. In recognition of that fact, the Corporation will schedule voluntary meetings with the Physician. Physician, along with his or her office staff, can voluntarily agree to meet with the Corporation to discuss matters of importance to the Program.  Physician shall receive appropriate Continuing Education Unit (CEU) credit for their attendance and participation at said meetings.

4.13    Physician shall refer Members only to Preferred Physicians, Preferred Podiatry Providers, Preferred Laboratory and Participating Hospitals. Physician must coordinate services outside of the Preferred Provider Network with the Corporation's Health Management/Medical Director, or his/her designee, prior to referring members out-of-network.

4.14    Physician shall not allow non-Preferred physicians or other allied health professionals to bill the Corporation for services using the Physician's provider number.  Physician shall also not bill Corporation for a date of service other than the actual date the service was performed.  Violation of these provisions may result in immediate termination from the Program and require refund to, or other recoupment by, Corporation for all amounts erroneously paid pursuant to such use.

4.15    Physician must report, within 45 days of the occurrence, any license or prescribing restrictions, limits on hospital privileges, and/or malpractice judgements, or any report made to the National Practitioner Data Bank or be subject to termination from the Program.

4.16    Physician shall, upon request by Corporation, participate in the Program's Credentialing, Quality Management, Member Grievance, and Disciplinary process.

4.17    Preferred general practice, family practice, internal medicine, geriatrics and OB/GYN physicians will exercise reasonable efforts to arrange for 24 hour, seven day per week call coverage.  Exceptions will only be allowed in areas of limited provider access.  The Corporation's Health Management/Medical Director or his or her designee must approve any exceptions to this requirement.

4.18    Physician, if accepted by Corporation into the Preferred Medical Doctor Program after April 1, 2000, agrees to actively participate in the use of InfoSolutions®.  Physician shall access authorized patient medical record information through the InfoSolutions® medical information network, and shall submit authorized medical record information through the InfoSolutions® medical information network as this capability is made available. In addition, Physician shall submit Member and claim inquiries to Corporation through InfoSolutions®.  Physician agrees, as a condition to continued participation in the Preferred Medical Doctor Program, to sign an InfoSolutions® Physician contract with Corporation.

V.  CORPORATION SERVICES AND RESPONSIBILITIES

5.1    Corporation agrees to pay Physician for the Medical services in accordance with the provisions of Article VI.  In the event Corporation through error pays benefit amounts to its Member rather than Physician for Medical Services, Corporation shall pay Physician for Medical Services in accordance with Article VI, and may seek refund of such erroneous payment from its Member.

7

5.2    Corporation shall process all of Physician's "clean claims" within 30 calendar days.  "Clean claims" means those claims submitted by Physician in accordance with Section 4.8 which are accurately completed and contain all information specified by Corporation and which do not require further information for processing by Corporation from either Physician, Member, or any other party.

5.3    Corporation agrees to consult with and obtain the advice of the Physicians Advisory Committee concerning the appropriateness of the criteria contained in Article VII and in Exhibits C, D, E, F, and G, H and I and to utilize such consultation and advice in the modification of those Exhibits.

5.4    Corporation agrees to grant Physician the status of Preferred Physician", to identify Physician as a Preferred Physician in information concerning its Preferred Medical Doctor Program distributed to Members, and to encourage Members to seek necessary services from Preferred Physicians.  Corporation agrees to continue Physician's status as a Preferred Physician until this Agreement terminates in the manner provided in Article XI.

5.5    Corporation agrees to provide Physician with a list of all Preferred Physicians and other Preferred Care Providers participating in the Preferred  Care Program.

5.6    Corporation agrees to identify to Physician, by either identification cards, bulletins, or other appropriate means, those Members who are entitled to Preferred Medical Doctor Program benefits.

5.7    Corporation shall provide education materials for its Members explaining the design, goals and objectives of the Preferred Medical Doctor Program, the scope of benefits, and Utilization Review.

5.8    From the usual and customary billing data submitted by Physician in accordance with Section 4.8, Corporation agrees to update its "Usual, Customary and Reasonable" fee program data files in accordance with its normal business practices.  Payments made by Corporation under this Agreement shall not be utilized for, and shall have no effect upon, "usual fee" determinations made by Corporation under its Usual, Customary and Reasonable fee program established for its non-governmental lines of business.

5.9    Corporation shall periodically provide Physician with administrative bulletins, group benefit summaries, claims submission guidelines, and other administrative details to assist Physician in obtaining prompt and expeditious payment and promote efficient submission and processing of Physician's claims for Medical Services.

5.10   There will be a Physicians Advisory Committee and one or more Physician Hearing Committees which will be established in the following manner for the following purposes:

   A.   Physicians Advisory Committee

        Purposes.  The Physicians Advisory Committee shall serve as the principal liaison between the Preferred Physicians and Corporation for the purposes of providing to Corporation advice and recommendations relating to matters involved and arising in the Preferred Medical Doctor Program that pertain to the practice of medicine and the quality of medical care.  The functions of the Committee shall include the

8

provision of advice and recommendations to Corporation concerning (a) medical treatment criteria under Section 7.1, (b) Utilization Review policies and procedures, (c) criteria in Exhibit C for outpatient diagnostic workups, (d) other matters involving professional medical expertise and judgment and the quality of medical care, and (e) the course and direction in general of the Preferred Medical Doctor Program in relation to professional matters involving the practice of medicine. In the performance of its functions the Committee shall consult with Preferred Physicians, including medical specialty organizations or groups as appropriate.

<u>Composition</u>.  The Physicians Advisory Committee shall be composed of one member elected from each of the United States Congressional Districts of Alabama in which the Preferred Medical Doctor Program has been established and is in active operation.  Each member of the Advisory Committee must be a Preferred Physician, must be a medical practitioner in the Congressional District from which elected, and shall be elected for a term of two years by vote of the Preferred Physicians practicing in that Congressional District.  Preferred Physicians elected on or after April 1, 1997, shall be elected for a term of three years by vote of the Preferred Physicians practicing in that Congressional District.

<u>Election</u>.  Any Preferred Physician may nominate Preferred Physician candidates within his Congressional District for election to the Physicians Advisory Committee.  The Advisory Committee member for each Congressional District will be elected from the nominees in each District by plurality mail ballot vote of the Preferred Physicians within each District.  Nominations and elections shall be conducted each two years for each Congressional District.  Effective April 1, 1997, nominations and elections shall be conducted each three years for each Congressional District.

<u>Supervision of Elections</u>.   The Physicians Advisory Committee shall supervise the conduct of and certify the results of each District election under rules and procedures adopted by it.

<u>Rules and Procedures</u>.  The Physicians Advisory Committee shall establish, and may amend from time to time, rules and procedures consistent with the provisions of this Agreement and applicable law for the governance and operation of the Physicians Advisory Committee and the Physician Hearing Committees.  Such rules shall require that the Physicians Advisory Committee shall meet not less often than quarterly, shall provide for the conduct and supervision of elections of Physicians Advisory Committee members, shall include procedures for the hearing and determination of disputes by Physician Hearing Committees, and may include provisions for staggered terms of Advisory Committee members. Copies of such rules and procedures, and amendments thereof, shall be distributed to all Preferred Physicians.

b.   <u>Physician Hearing Committees</u>

<u>Purpose</u>.  One or more Physician Hearing Committees shall determine accordance with Section 8.2 any disputes between Preferred Physicians and Corporation concerning Utilization Review under Article VII.

<u>Establishment and Composition</u>.  The Physician Hearing Committee or Committees shall be established by the Physicians Advisory Committee. The number of Physician Hearing Committees and the number of members comprising each such Committee shall be determined by the body establishing them.

9

c.   Costs

Corporation shall pay the costs of the Physicians Advisory Committee and Physician Hearing Committee or Committees.

VI.   PAYMENT AND BILLING

6.1   Corporation will pay to Physician for Medical Services the fee amounts as specified for the medical procedures in the Fee Schedule, except when greater amounts are payable under paragraph a. or b. below, and except as otherwise specified in any of the paragraphs following Section 6.1(c).

a.   For those surgical procedures listed in Exhibit H and performed in the Physician's Office, Corporation will pay one hundred twenty-five percent (125%) of the fee amounts in the Fee Schedule. Fee amounts resulting from application of the 125% factor will be rounded to the nearest whole dollar. Corporation may add or delete procedures to Exhibit H with the advice and consultation of the Physicians Advisory Committee and with sixty (60) days advance notice to Physician.

b.   Corporation will pay the amount of Physician's charges for Medical Services consisting of outpatient professional cognitive services performed in the Physician's Office for diagnosis of the symptoms set forth in the Outpatient Diagnostic Workup Global Fee Schedule (Exhibit B), subject to the maximum global fee specified in Exhibit B for the symptom diagnosed and if the criteria specified in Exhibit C for such symptom are satisfied. In addition to the global fee payable for Physician's professional cognitive services, the "Usual, Customary, and Reasonable" charges will be paid for tests and consultations required in conjunction with such outpatient diagnostic workups.

c.   As used in this section:

(1)   "Physician's Office" means the place in which Physician normally maintains and carries on his practice of medicine and is a place not located in a health care facility which either is licensed or certified by a federal or state agency or renders a facility charge for use of the facility or its equipment in addition to a charge for the Physician's services.

(2)   "Performed in the Physician's Office" means when the place of performance of the Services is properly and accurately designated on the claim form as the Physician's Office (presently designated as Corporation's "place of service"" code 3).

(3)   "Surgical procedures" mean the procedures which are or would be designated under the present CPT codes 10000 through 69999 or Corporation's procedure codes having a "T" prefix.

d.   For outpatient laboratory services specified in Exhibit K and for certain specified radiology services provided Members, Corporation shall pay the lesser of Physician's charges or the amount set forth in the Laboratory Service Schedule and the Radiology Services Schedule, respectively, as established by Corporation and in effect as part of Preferred Laboratory Service Agreements and Preferred Radiology Service Agreements between Corporation and such Preferred Providers. Corporation will not cover or reimburse Physician, and the Physician will not bill the Member for outpatient laboratory services not contained in Exhibit K, unless the Physician's laboratory is approved and certified by Corporation to perform outpatient laboratory services not contained in Exhibit K, in

10

which case reimbursement shall be made by Corporation at the lesser of Physician's charges or the amount set forth in the Laboratory Service Schedule established by Corporation and in effect as part of the Preferred Laboratory Service Agreements between Corporation and such Preferred Providers.

e.  Effective June 1, 2000, for services identified as or falling within the scope of the Radiation Oncology Services listed in Exhibit L (to be provided by April 1, 2000), as amended by the Corporation from time to time, the Corporation will pay to Physician a Global Case Rate Reimbursement Fee for each Member course of treatment ("Case Rate Fee"). The amount of the Case Rate Fee will be determined by the Corporation based upon information supplied by Physician for each Member course of treatment.

f.  The portion of the Fee Schedule applicable to injectable drugs will be determined by the Corporation using an amount equal to (i) the average wholesale price (AWP) or (ii) a specified percentage of the AWP. In addition, Physician will be reimbursed only one administration allowance of Five Dollars ($5.00) for injectable drugs for each separate injection. Notwithstanding anything in Section 6.5 to the contrary, the portion of the Fee Schedule applicable to injectable drugs will be updated on or about April 1st and October 1st each year based on the AWP from public sources. Physician will be notified of updated fees at least fifteen (15) days prior to the effective date of reimbursement for the adjusted fees.

6.2  Physician will seek payment only from Corporation for the provisions of Medical Services to all Members covered by a Benefit Agreement, except where payment is available from another group health plan (other than one provided by Corporation) for the Service provided. In such case, Physician may also seek payment from such other group health plan. Physician may not seek additional payment from individual insurance policies such as, but not limited to, individually purchased accident, disability, cancer and other dread disease policies.

In cases involving application of coordination of benefits or non-duplication of benefits provisions of Benefit Agreements when the Member is covered under a Benefit Agreement and another health benefit plan or program (except another group plan underwritten or administered by Corporation), the following rules shall apply:

a.  For cases in which Corporation is the primary plan, Physician may bill the Member's secondary benefit plan for any difference between the fee amount payable under this Agreement and Physician's usual charge for the Medical Service provided.

b.  For cases in which Corporation is the secondary plan, Corporation shall pay Physician any difference between the amount payable by the Member's primary plan and the fee amount payable under this Agreement for the Medical Service provided.

6.3  Physician agrees to accept the fee amount payable under this Agreement or Physician's billed charge amount, whichever is less, as payment in full for each Medical Service provided to a Member. Such payment shall be for Medical Services provided on or after the effective date of this Agreement and during the time the Member's Benefit Agreement is in effect.

6.4  Corporation shall utilize the Physicians' Current Procedural Terminology ("CPT") publication by the American Medical Association in establishing

11

and updating the Fee Schedule. As CPT coding revisions and updates are issued by the American Medical Association, Corporation will utilize such updates and revisions as appropriate.

6.5    a.  The fee amounts set forth in the Fee Schedule and in the Outpatient Diagnostic Workup Global Fee Schedule will be reviewed by the Corporation each year based on the competitive health care environment in which the Preferred Medical Doctor Program is offered. The decision to adjust the Fee Schedule will be made solely by the Corporation. If the Corporation determines that there will be no adjustment to the fee amounts set forth in the Fee Schedule and/or the Outpatient Diagnostic Workup Global Fee Schedule for a given year, the Corporation shall notify Physician of said decision in its regular written communications medium addressed to Preferred Physicians on or about March 15th of each year. If the Corporation determines that there will be an adjustment to some of the fee amounts set forth in the Fee Schedule and/or the Outpatient Diagnostic Workup Global Fee Schedule, the Corporation shall make available to Physician an updated Exhibit A (or requested portions thereof) containing updated fee amounts for the adjusted procedures and an updated Exhibit B as adjusted, to become effective April 1st for the ensuing twelve-month period. Corporation shall notify Physician of the availability of the Updated Exhibit A and Exhibit B in its written communications medium addressed to Preferred Physicians on or about March 15th of each year.

b.    Amounts in the Fee Schedule for new procedures established pursuant to Section 6.6 and Fee Schedule adjustments pursuant to Section 6.7 shall be included on the updated Exhibit A which is made available to Physician on or about March 15.

6.6    In order to maintain a Fee Schedule which is reflective of and current with evolving changes in medical practice, Corporation may from time to time recognize newly developed medical procedures and prescription drugs to add to the Fee Schedule and delete outmoded or inappropriate medical procedures from the Fee Schedule. Corporation will consult with and be advised by the Physicians Advisory Committee concerning the addition or deletion of procedures from the Fee Schedule. Effective April 1, 2000, all newly developed medical procedures and prescription drugs must be precertified by Corporation. Corporation will give at least 30 days' written notice of any newly developed medical procedure or prescription drug that requires precertification by the Physician. Physician will not bill Member, and Member will not be responsible for such procedures not precertified. As newly developed medical procedures are recognized by Corporation for payment under this Agreement, Corporation will establish fee amounts for such new procedures which, using Corporation's relative value indices, are proportionally equivalent to those for other procedures of similar nature and complexity.

6.7    Corporation's purpose and intent shall be to maintain a Fee Schedule in which the amounts are neither excessively high nor excessively low for any procedure when compared to charges for the same procedure by most Alabama physicians. Therefore, for the purpose of correcting inequities in the Fee Schedule which may occur due to adjustments and changes in medical treatment modalities and physician charging practices. Corporation may review and (after giving notice as prescribed by Section 12.7) adjust, either upward or downward, individual Fee Schedule amounts pursuant to a. or b. below:

a.    A Fee Schedule amount may be adjusted pursuant to this provision when it is less than the average amount or greater than the 90th percentile amount of all charges for the same procedure, based upon all non-

12

governmental program physician charge data received by Corporation during the most recent calendar year. Such adjustment may be made upward at any time but may be made downward only as of the next April 1st of each year.

    b.    After consultation with the Physician's Advisory Committee, Corporation may adjust a Fee Schedule amount downward through use of Corporation's relative value indices when it is reasonable to do so for reasons which include, but are not limited to, the following:

        (1)    The charges made for services do not reflect the influence of a competitive marketplace, e.g., the charges for a particular procedure are higher than those for a procedure of comparable difficulty because the procedure is being performed by only one Physician or a few Physicians in the area;

        (2)    There have been sudden increases in charges that cannot be readily explained by the normal rate of inflation or by other economic factors or technology;

        (3)    The charges do not reflect changing technology or reductions in acquisition or production costs;

        (4)    A charge was set for a procedure when it was first established, but time and effort-saving simplifications of the technology or surgical technique used, and/or substantial reductions in the time and extent of physician involvement have not led to commensurate reductions in the charge made for the procedure; or

        (5)    The charges made for an item or service are higher to Preferred Medical Doctor patients than to other competing, private benefit programs.

No more than one-half of one percent (0.5%) of Medical Services may be adjusted downward during any annual period commencing each April 1st under this subparagraph b.

6.8    Physician will furnish, upon request, all information reasonably required by Corporation or a Physician Hearing Committee to substantiate the provision of Medical Services, the Medical Necessity of such Services, and the charges for such Services. Corporation may review all claims submitted by Physician, and relevant medical records of Members when necessary, to appropriately apply the terms of this Agreement or the applicable Benefit Agreement of the Member.

6.9    The inclusion of a procedure on an Exhibit does not mean that payment will be made for the procedure in all cases. Payment for any procedure will be dependent on whether the procedure is Medically Necessary in the circumstances and within the terms of the Benefit Agreement under which the Member receiving the Service is covered.

6.10    For all Medically Necessary services and supplies not covered under the Program (e.g. physical therapy, allergy testing, durable medical equipment, etc.), the Physician agrees to accept the lesser of his actual charges or the Usual, Customary and Reasonable ("UCR") amount, as calculated by the Corporation and the applicable co-payment, as payment in full. Physician shall not bill the Member for amounts above the UCR amount.

6.11    For anesthesia services, the Corporation will provide reimbursement in fifteen minute time units if the anesthesiologist personally performs

13

the service or employs the Certified Registered Nurse Anesthetist (CRNA). If the CRNA is not employed by the anesthesiologist, then thirty minute time units will be used in the reimbursement calculation.

VII.    UTILIZATION REVIEW

7.1     For the purpose of providing to Members appropriate Medical Services and Hospital Services that both are Medically Necessary and are provided in the least costly setting consistent with the Member's condition and need for quality medical care, it is agreed that such Services will be provided or prescribed consistently with the following treatment criteria, except when, in the professional judgment of Physician, it is Medically Necessary that such Services be provided or prescribed otherwise than in accordance with such criteria:

a.  Pre-admission Review and certification of Medical Necessity for inpatient hospital admissions will be obtained for the diagnoses listed in Exhibit D., except in Emergency cases.  Also, whenever appropriate and possible, Physician will arrange for pre-admission testing of Members.

b.  "Office Surgery Procedures" listed in Exhibit E will be performed only in the Physician's Office, except in Emergency cases.  "Physician's Office" has the same meaning given it in Section  6.1.c.

c.  "Outpatient Surgery Procedures" listed in Exhibit F will be performed only in the Physician's Office or a hospital outpatient, ambulatory surgery, or other outpatient treatment facility, except in Emergency cases.

d.  Second Surgical Opinions are not required under the Program unless otherwise specified in the Member's Benefit Agreement.

e.  Members will not be admitted to hospitals on Fridays or Saturdays except (I) in Emergency cases, or (ii) to those hospitals, and for those conditions and symptoms, as Corporation may from time to time specifically exclude from application of this limitation, as evidenced in writing by Corporation to Physician, or (iii) for "same day surgery" or other admissions for non-overnight treatment.

f.  "Standing orders" or routine admission test batteries will not be issued upon admission of Members to hospitals, but only those tests and procedures which are cost effective and directly related to and necessary for evaluation and treatment of the Member's condition and symptoms and specific health risks will be ordered.  This limitation shall not apply so as to conflict with regulatory or licensing requirements and hospital medical staff by-laws or rules pertaining to diagnosis-specific admission test batteries.

g.  If "Precertified Procedures" listed in Exhibit I are performed in a Concurrent Utilization Review Program (CURP) hospital listed in Exhibit J, the precertification requirement will be waived, unless otherwise specified in the Member's Benefit Agreement.  If the precertified procedures listed in Exhibit I are not performed in a CURP hospital these procedures must be precertified in writing by the Corporation as to Medical Necessity prior to the time such procedure is performed, except in Emergency cases, or no payment will be made to Physician for the Medical Services consisting of such procedures, whether or not such procedures are determined to be Medically Necessary.  In Emergency cases, Physician must notify Corporation by telephone prior to, whenever

14

possible, or otherwise within 24 hours of (or by the end of the first working day if performed on a weekend or holiday) the performance of the procedure to verify the Medical Necessity of such procedure. Corporation may add or delete procedures to Exhibit I with the advice and consultation of the Physicians Advisory Committee and with sixty (60) days advance notice to Physician.

Notwithstanding the foregoing criteria, Physician at all times will have the right and responsibility to determine the appropriateness and quality of care rendered to Members and, whenever in his professional judgment care or treatment which differs from that set forth in the above criteria is indicated by the Member's particular condition, Physician may render such care or treatment in keeping with his professional judgment. In such exceptional cases, Physician will attach to his claim for payment an explanatory statement (together with copies of any treatment notes or other patient medical records which he deems relevant) to substantiate his claim for payment for such exceptional care or treatment.

7.2    Also in furtherance of the purposes of this Agreement to provide only those Medical Services and Hospital Services that are Medically Necessary and appropriate for a Member's condition, there will be Utilization Review consisting of:

a.    "Pre-admission Review" to determine whether an anticipated inpatient hospital admission is Medically Necessary (which will include pre-admission certification in accordance with Section 7.1.a.).

b.    "Concurrent Review" to determine whether an inpatient admission not subject to Pre-admission Review is Medically Necessary, and to determine whether the length of an inpatient hospital stay and Services incident thereto are Medically Necessary.

c.    "Retrospective Review" to determine whether a Hospital Service or Medical Service already provided was Medically Necessary.

7.3    With respect to inpatient hospital admissions and stays of Members, Utilization Review will be conducted as follows:

a.    In those Blue Cross Participating Hospitals which have agreed to perform concurrent utilization review, Concurrent Review for purposes of this Agreement will be performed by the appropriate physician advisor and concurrent utilization review committee established in such hospitals. All inpatient hospital admissions will be subject to Retrospective Review to determine whether such admissions were Medically Necessary and to determine whether the length of the inpatient stay and Medical Services were Medically Necessary. If an admission or any portion thereof in such hospital is denied on the basis of Retrospective Review, the Physician's claims for Medical Services during the denied admission (or portion thereof) will also be denied upon Retrospective Review and payment may be recouped or offset against future payments due Physician as Corporation shall elect.

b.    In those hospitals which have not agreed to perform concurrent utilization review, certification for purposes of this Agreement will be performed by Corporation utilizing its medical advisor or, in appropriate cases requiring specialty consultation, its medical specialty consultants. All inpatient hospital admissions will be subject to Retrospective Review to determine whether such admissions were Medically Necessary and to determine whether the length of the inpatient stay and Medical Services were Medically Necessary. If an

15

admission or any portion thereof in such hospital is denied on the basis of Retrospective Review, the Physician's claims for Medical Services during the denied admission (or portion thereof) will be denied upon Retrospective Review and payment may be recouped of offset against future payments due Physician as Corporation shall elect.

7.4    With respect to all Medical Services performed in a hospital outpatient, ambulatory surgery, or other outpatient treatment facility, claims for such Services will be subject to Retrospective Review by Corporation for purposes of determining whether such Services were performed consistently with the criteria set forth in Section 7.1, if applicable, or were otherwise Medically Necessary. All Medical Services performed on an outpatient basis are subject to Retrospective Review and if they are found not to be Medically Necessary, payment may be recouped or offset against future payments due Physician as Corporation may elect.

7.5    In its evaluation of claims under this Agreement, Corporation shall not deny payment for Medical Services which it deems to be not Medically Necessary unless it has obtained and is acting upon the advice of its medical advisor, an independent medical specialty consultant, a Physician Hearing Committee, or the Physicians Advisory Committee.

7.6    If Physician provides Medical Services to Members which are determined to be not payable under any provision of this Article VII, Physician may nevertheless seek payment for such Services by submission to Corporation of a statement of explanation of the need for such Services and the setting in which they were performed, including copies of all necessary and relevant medical records, in support of his claim for payment. If Corporation agrees that such Services were Medically Necessary, Corporation shall pay Physician for such Services in accordance with Article VI. If Corporation determines that the Services rendered were not Medically Necessary, or were not required to be performed in the setting chosen by the Physician, Physician will not receive payment for those Services from the Member or Corporation. Physician may obtain review of Corporation's determination by appeal to a Physician Hearing Committee and by arbitration before an Arbitration Panel as provided in Article VIII.

7.7    If as the result of a final determination through appeal and arbitration under Article VIII it is determined that a Medical Service is payable, Corporation shall make payment to Physician for such Services in accordance with Article VI. If a Medical Service is determined to have not been Medically Necessary or not required to have been performed in the setting chosen by Physician, Physician shall have no right to payment from Corporation or Member.

VIII.    DISPUTE RESOLUTION

8.1    Corporation and Physician agree to meet and confer in good faith to resolve any problems or disputes that may arise under this Agreement.

If the problem or dispute stems from or is related in any way to a determination made by the Corporation under Article VII, and if Physician wishes to invoke the dispute resolution provisions of this Article VIII, Physician must request a meeting with Corporation under this Section 8.1 within 45 days of the date on which the Corporation notifies Physician of its determination under Article VII. Physician's request must be in writing, and must be received by the Corporation's medical director within the 45 day time frame. If Physician fails to timely request a meeting under this Section 8.1, Physician expressly agrees and understands that he shall be deemed to have waived any and all rights

16

(whether under this Agreement or not) to contest Corporation's determination.

8.2     It is the mutual intent and purpose of the parties that issues of Medical Necessity and related issues requiring medical judgment and expertise arising under this Agreement be resolved by panels of practicing Physicians, and that such resolutions be final and binding upon both parties. Accordingly, in the event that any dispute arising under Article VII of this Agreement concerning Utilization Review is not satisfactorily resolved between the parties under Section 8.1, Corporation and Physician agree to resolve such dispute in the following manner:

    a.   Appeal to Physician Hearing Committee. Such dispute shall be presented for determination by a Physician Hearing Committee established under Section 5.10. Either party may request a hearing for presentation of the disputed matter. If a hearing is requested, both parties will be notified of the time and place of hearing. In the absence of request for a hearing, the Physician Hearing Committee shall make its determination on the records presented by each party. The Physician Hearing Committee shall render its determination within thirty (30) days after submission of the dispute on records or through a hearing. Such determination, in the absence of a timely notice or arbitration as provided below, shall become final and binding on both parties upon the passage of thirty (30) days following the date of determination by the Physician Hearing Committee.

    b.   Arbitration. If either party desires to arbitrate the determination of a Physician Hearing Committee, a notice of arbitration shall be mailed to the opposite party not later than thirty (30) calendar days from the date of the Physician Hearing Committee determination. An Arbitration Panel shall be comprised of one member appointed by the Physician, one member appointed by Corporation, and a third member appointed jointly by the appointees of the Physician and Corporation. All members of the Arbitration Panel shall be licensed physicians. Following appointment, the Arbitration Panel shall review the matter in dispute and render a written decision. Determination of the Arbitration shall be binding on the parties and shall become final as of the date of notice thereof to both parties. Reasonable costs of conducting the Arbitration Panel shall be paid by the party against whom the determination is rendered, and each party shall bear its own respective costs of presenting the matter to the Arbitration Panel.

8.3     Determinations made by the Physician Hearing Committee and the Arbitration Panel concerning disputes arising from the Utilization Review provisions of the Agreement which become final and binding on the parties in accordance with this Article shall be enforceable in any court of competent jurisdiction. Neither party shall have any right, claim, or action against the other, and each party hereby agrees not to bring any judicial action or proceeding against the other to enforce, apply, or otherwise resolve issues governed by the provisions of Articles VII and VIII hereof, except for the enforcement of determinations made pursuant to the remedies provided in this Article VIII.

8.4     It being the intent and purpose of the parties in promoting and furthering the purposes of this Agreement, which include moderating and containing the cost of health care and enhancing the relationship among members and Participating Physicians and Corporation, and the parties having acknowledged by this Agreement that the provision of health care pursuant to this Agreement takes place in and substantially affects

17

interstate commerce and that the Federal Arbitration Act permits and promotes the use of arbitration as a means of dispute resolution in matters arising from interstate commerce, the parties accordingly adopt the following provisions with the purpose of effecting a more beneficial, efficient and effective means of dispute resolution.

a.  Any controversy, dispute, or claim by any Member arising out of the rendering of medical services by the Participating Physician shall be submitted to   binding arbitration pursuant to the provisions of the Federal Arbitration Act, 9 U.S.C. § 1, et seq., provided that the Member is required to submit such claims to binding arbitration under the applicable Benefit Agreement at the time the services in question are rendered.  Such arbitration shall be governed by the rules and provisions of the American Arbitration Association's Dispute Resolution Program for Insurance Claims.

Physician further understands that the arbitration shall be binding upon Physician as well as the Member and that it may not be set aside in later litigation except upon the limited circumstances set forth in the Federal Arbitration Act.

Judgment upon the award rendered by the arbitrator may be entered in any Court having jurisdiction thereof.  The arbitration expenses shall be borne by the losing party or in such proportion as the arbitrator(s) shall decide.

IX.   RECORDS

9.1   The Parties shall prepare and maintain all appropriate records on Members receiving Medical Services.  The Parties shall maintain the confidentiality of the Member's health and personal information. The records shall be maintained in accordance with prudent record-keeping procedures and as required by law, and as may be needed by the parties hereto for performance of this Agreement.

9.2   Physician agrees to allow audit and duplication (at Corporation's expense) of billing, payment and medical records pertaining to Members enrolled under a Preferred Medical Doctor Program Benefit Agreement. Such audit and duplication will be allowed upon reasonable notice during regular business hours.

9.3   Medical records of Members will be made available to Corporation for Utilization Review purposes upon reasonable request.  Corporation warrants that it has a contractual right with its Members to obtain any and all patient information from Physician relevant to a determination of whether and to what extent benefits may be provided under Benefit Agreements.

9.4   Corporation's right to obtain refund or recovery of overpayments shall be limited to actual amounts of payments due to circumstances amounting to fraud obtained from case-by-case review.  Refund or deduction of such overpayment amounts shall be made in accordance with Section 4.9.

X.  MARKETING

10.1   Corporation shall use its best efforts to encourage Members to use the services of Physician.  Such efforts shall include, by way of example and not limitation, the following:

a.  During the term of this Agreement and prior to receipt of any notice of

18

its termination, Corporation shall identify Physician as a Preferred Physician to customer group accounts which have entered into Benefit Agreements and which have Members residing in the geographic area of Physician's practice.

    b.    Corporation shall design and promote Benefit Agreements for its customer group accounts which provide greater health care and financial benefits and other incentives to Members to utilize Preferred Physicians.

10.2    While this Agreement is in effect Corporation may use the name of Physician for purposes of informing Members of the identity of Preferred Physicians (unless Corporation is instructed to the contrary in writing by Physician) and otherwise carrying out the terms of this Agreement; likewise, Physician shall have the right to inform his patients and the public that he participates in the Preferred Medical Doctor Program.

10.3    Except as provided in Section 10.2, Corporation and Physician each reserves the right to, and the control of the use of, its name and all symbols, trademarks and service marks presently existing or later established. In addition, except as provided in Section 10.2, neither Corporation nor Physician shall use the other party's name, symbols, trademarks or service marks without the prior written consent of that party and shall cease any such usage immediately upon written notice of that party.

## XI.   TERM AND TERMINATION

11.1    When executed by both parties, this Agreement shall become effective as of the date indicated in the Application and shall continue in effect until terminated.

11.2    Either party may terminate this Agreement by giving at least sixty (60) days advance written notice thereof to the opposite party. Except for certain circumstances permitting termination with less than sixty (60) days notice as provided for in Sections 4.14, 11.3, 11.4, 12.5, and 12.7, termination of this Agreement shall be effective the sixtieth day following the date such notice is mailed, first class postage pre-paid, to the opposite party. During the interim period from notice of termination to the effective date of termination, this Agreement shall remain in full force and effect and be fully binding upon both parties. Nothing contained herein shall be construed to limit either party's lawful remedies in the event of a material breach of this Agreement.

11.3    After consultation and with the advice of the Physicians Advisory Committee, Corporation may terminate this Agreement on thirty (30) days advance written notice to Physician on grounds of: (I) abuse (which means a continuation by Physician of a pattern of excessive or inappropriate services after warning by Corporation to desist); (ii) failure to timely notify Corporation (within 45 days) of licensure restrictions, and/or prescribing limits or hospital privileges or malpractice judgements as required by Section 4.15; (iii) repeated violation of the provisions of this Agreement by Physician; (iv) attempts to discourage companies or patients from participating in the Preferred Medical Doctor Program or participation in an organized public campaign to damage the Program; or (v) falsification or other misrepresentation of any information concerning the Program. Corporation may terminate this Agreement on thirty (30) days advance written notice to Physician for action found by either the Physicians Advisory Committee or other committee of Physician's peers constituting a peer review, grievance, or disciplinary committee organized by a county or state medical society or association to be abusive,

19

unprofessional or unethical behavior related to such Program. The foregoing provisions do not prevent Physician from discussing the relative merits of various programs, from explaining various utilization features of the Preferred Medical Doctor Program, from recommending a non-preferred provider when he believes that this is in the medical interest of the patient, or from discussing changes in the way health care is financed and delivered. Any termination under this Section shall be effective the thirtieth day following the date that notice of termination is mailed. Physician may appeal such notice of termination to the Corporation, and will be afforded an opportunity to present to Corporation any oral or written statements and supporting documentation concerning the matter within the thirty (30) day period prior to the effective date of such termination. Following withdrawal or termination from the Preferred Medical Doctor Program, Physician will take reasonable steps to notify patients that he no longer participates in the Preferred Medical Doctor Program.

11.4    Corporation may terminate this Agreement immediately, upon registered mail notice to Physician, for the following reasons: (I) fraud by Physician, or any of Physician agents or employees; (ii) permitting the use of Physician's provider number by another provider of health care.

11.5    After the effective date of termination, the necessary provisions of this Agreement shall remain in effect for the resolution, in the manner herein provided, of all matters unresolved at the date of termination.

11.6    Notwithstanding termination, Corporation shall continue to have access as provided in Article IX for three (3) years following the date of termination to records necessary to carry out the terms of this Agreement.

XII.    GENERAL PROVISIONS

12.1    Assignment.  No assignment of the rights, duties, or obligations of this Agreement shall be made by Corporation or Physician, except that Physician may assign his right to payments under this Agreement to a professional association, professional corporation, foundation, or other group practice arrangement of which he is a member, owner, or employee. Any attempted assignment contrary to this provision by either party shall be void and have no binding effect upon the opposite party.

12.2    Waiver of Breach.  Waiver of a breach of any provision of this Agreement shall not be deemed a waiver of any other breach of the same or a different provision.

12.3    Notices.  Any notice required to be given pursuant to this Agreement shall be in writing and shall be sent by first-class, postage prepaid, to Corporation at:

>       Blue Cross and Blue Shield of Alabama
>       450 Riverchase Parkway East
>       Birmingham, Alabama 35298

and to Physician at his address as shown on the most recently dated Application or other written notification of address on file at Corporation's offices.

12.4    Severability.  In the event any provision of this Agreement is rendered invalid or unenforceable by an Act of Congress or of the Alabama Legislature or by any regulation promulgated by officials of the United States or the State of Alabama, or declared null and void by any court

20

of competent jurisdiction, the remainder of the provisions of this Agreement shall, subject to Section 12.5, remain in full force and effect.

12.5    <u>Effect of Severable Provision</u>.  In the event that a provision of this Agreement is rendered invalid or unenforceable or declared null and void as provided in Section 12.4 and its removal has the effect of materially altering the obligations of either party in such manner as, in the judgment of the party affected, (a) will cause serious financial hardship to such party; or (b) will substantially disrupt and hamper the mutual efforts of the parties to maintain a cost-efficient means of delivery of health care services; or (c) will cause such party to act in violation of its corporate Articles of Incorporation or By-laws, the party so affected shall have the right to terminate this Agreement upon thirty (30) days' prior written notice to the other party.

12.6    <u>Entire Agreement</u>.  This Agreement, including its Exhibits and the Application, contains the entire Agreement between Corporation and Physician relating to the rights granted and the obligations assumed by the parties.  Any prior agreements, promises, negotiations or representations, either oral or written, relating to the subject matter of this Agreement and not expressly set forth in this Agreement or an Amendment executed with the same formality as this Agreement are of no force or effect.

12.7    <u>Amendments</u>.  This Agreement or any part of it may be amended at any time during its term by mutual written consent of the parties. This Agreement or any part of it may be amended by Corporation by mailing such amendment or a revised form of Agreement to Physician at last sixty (60) days prior to the effective date of such amendment.  No amendment to the Fee Schedule (as defined in Section 2.4) may be made unilaterally by Corporation except in accordance with Sections 6.5, 6.6 and 6.7.  Any amendments hereunder to Article VII, Article VIII, or to Exhibits C, D, E, F, G, H, or I to this Agreement will be made only with the advice and consultation of the Physicians Advisory Committee.  In the event an amendment by Corporation is not acceptable to Physician, then Physician may terminate this Agreement by giving written notice to Corporation within the sixty (60) day period prior to the effective date of the Amendment.  Any such notice of termination shall be effective as of the date of the Amendment.  In the absence of written notice of termination by Physician, Physician shall be deemed to have accepted such amendments(s) as of the effective date thereof.

12.8    <u>Attorneys' Fees</u>.  In the event that either Corporation or Physician institutes any arbitration proceeding or judicial proceeding to enforce the provisions of this Agreement, each party shall bear his own costs and attorneys' fees.

12.9    <u>Headings</u>.  The headings of articles and sections contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

12.10   <u>Gender</u>.  Whenever the masculine gender is used in this Agreement, it shall also mean and refer to the feminine gender whenever appropriate.

12.11   <u>Non-Exclusivity</u>.  Nothing in this Agreement shall in any way be deemed to limit or restrict Physician from entering into other "preferred provider" or other similar arrangements with any other party.

12.12   <u>Governing Law</u>.  This Agreement shall be construed and enforced in accordance with the laws of the State of Alabama.

21

12.13    <u>Service Mark</u>.  Physician hereby expressly acknowledges his understanding that this Agreement constitutes a contract between Physician and Blue Cross and Blue Shield of Alabama, that Blue Cross and Blue Shield of Alabama is an independent corporation operating under a license from the Blue Cross and Blue Shield Association, an association of independent Blue Cross and Blue Shield Plans, (the "Association") permitting Blue Cross and Blue Shield of Alabama to use the Blue Cross and Blue Shield Service Marks in the State of Alabama, and that Blue Cross and Blue Shield of Alabama is not contracting as the agent of the Association. Physician further acknowledges and agrees that he has not entered into this Agreement based upon representations by any person other than Blue Cross and Blue Shield of Alabama and that no person, entity, or organization other than Blue Cross and Blue Shield of Alabama shall be held accountable or liable to Physician for any of Blue Cross and Blue Shield of Alabama's obligations to Physician created under this Agreement.  This paragraph shall not create any additional obligations whatsoever on the part of Blue Cross and Blue Shield of Alabama other than obligations created under other provisions of this Agreement.